[Cite as *State v. Hill*, 2024-Ohio-1717.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J. |
| | Hon. John W. Wise, J. |
| -vs- | |
| | Case No. 2023 CA 00069 |
| CHARLES HILL | |
| | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:      Criminal Appeal from the Court of Common Pleas, Case No. 2022 CR 02357


JUDGMENT:      Affirmed


DATE OF JUDGMENT ENTRY:      May 2, 2024


APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

KYLE L. STONE      D. COLEMAN BOND
PROSECUTING ATTORNEY      116 Cleveland Avenue, NW
VICKI L. DeSANTIS      Suite 600
ASSISTANT PROSECUTOR      Canton, Ohio 44702
110 Central Plaza South, Suite 510
Canton, Ohio 44702-1413

*Wise, J.*

**{¶1}** Appellant Charles Hill appeals his conviction on one count of Rape, entered in the Stark County Court of Common Pleas following a jury trial.

**{¶2}** Appellee is the state of Ohio.

## STATEMENT OF THE FACTS

**{¶3}** For purposes of this Opinion, the relevant facts and procedural history are as follows:

**{¶4}** On November 4, 2022, the Stark County Grand Jury indicted Defendant-Appellant, Charles Hill, with one count of Rape, in violation of R.C. §2907.02(A)(1)(b)/(B), a felony of the first degree.

**{¶5}** On June 5, 2023, the matter proceeded to jury trial.

**{¶6}** At trial, the jury heard testimony from Appellant's daughter Kaelyn Hill, the victim's mother Julie E., the victim S.M., Detective William Johnson and Nurse Practitioner Alissa Edgein.

**{¶7}** The first witness to testify at trial was Kaelyn Hill, the daughter of Appellant. (T. at 218-219). Kaelyn testified that she knows the alleged victim, S.M., because S.M.'s mother, Julie E., dated and their two families lived together in Alliance, Ohio. (T. at 219-220). Kaelyn testified that even though Appellant is no longer dating Julie E., she still maintains a close relationship with S.M. and thinks of her like a sister. (T. at 219). Kaelyn testified that Appellant dated Julie E. in late 2018 and early 2019 and that during that time she was 18 years old and S.M. was 11 or 12 years old. (T. at 219). Kaelyn testified that Appellant and Julie E. ended their relationship in October, 2019. (T. at 220).

**{¶8}** Kaelyn further testified that in the fall of 2021, she telephoned Julie E. because she was concerned that Appellant had sexually abused S.M. (T. at 220-221). She testified that when she called Julie E., she was in a car with S.M. (T. at 221). Kaelyn stated that when she raised these concerns to Julie E. over the telephone, S.M. overhead the conversation. (T. at 221). Kaelyn clarified that the telephone call that she made to Julie E. was a video call via FaceTime, and that she could see both Julie E. and S.M. and that S.M. "looked like when a kid is guilty of something and they don't want you to know that they are guilty of something." (T. at 222). She further testified that S.M.'s demeanor changed and she started bawling. (T. at 222). Kaelyn testified since the time of the phone conversation in the fall of 2021, she and S.M. have spoken a little bit about what happened. (T. at 223).

**{¶9}** Kaelyn also recalled that during the time they all lived together in Alliance, S.M. and Appellant camped outside in a tent together more than once. (T. at 223). She also recalled that Appellant built a shed in the backyard of the residence, and that he and S.M. also slept outside together in the shed. (T. at 223). Kaelyn testified that she thought this was weird but did not think it was weird in the sense that anything inappropriate was happening. (T. at 223).

**{¶10}** Kaelyn testified that looking back at the time when she lived with S.M. she noticed changes in S.M.'s behavior. (T. at 224). She recalled that when they first moved into the house together, S.M. was obsessed with her and always wanted to wear the same clothes and have her hair and makeup done, but then S.M. slowly started to stop wanting to wear the same clothes and wanted to be covered up instead. (T. at 224). She testified that S.M. began to cut herself and started taking medication for depression and

anxiety as well. (T. at 224). Finally, Kaelyn testified that S.M. never disclosed any abuse by the Appellant until the day that she called Julie E. about her concern for this abuse. (T. at 224).

{¶11} On cross-examination, Kaelyn testified that her concerns about potential sexual abuse of S.M. by Appellant came from Appellant's ex-girlfriend, Karla Lunde. (T. at 225). She further testified that she spoke to Detective Johnson from the Alliance Police Department about this case and told him that she never observed Appellant sexually assault S.M. (T. at 225). She admitted that she even questioned the concerns that were raised to her by Karla Lunde. (T. at 225).

{¶12} Kaelyn was asked if she went camping with Appellant often when she was younger and responded by stating "He was in prison a lot but ...", which Appellant objected to and it was ordered stricken from the record. (T. at 229). She then testified that she went to a lot of flea markets and camping with Appellant when she was younger. (T. at 229). She also testified that she was never abused by Appellant. (T. at 230).

{¶13} On re-cross, Kaelyn testified that Karla Lunde told her that Appellant told her very graphic details of things that he had done to S.M. and other children, as well as things that he planned to do to her children. (T. at 231). Appellant objected to these statements, and they were stricken from the record. (T. at 233). The jury was also instructed to disregard the statements. (T. at 233). Kaelyn then testified that Karla Lunde told her some specific things about S.M., and that she relayed that information to Julie E. (T. at 234). Kaelyn testified that Karla Lunde now lives in New York and was not willing to come to court to testify. (T. at 234-235).

**{¶14}** The next witness to testify at trial was S.M.'s mother, Julie E. (T. at 237). Julie E. testified that she currently lives with her fiancé, Josh, her daughter S.M., who is almost 16, and her son Caden who is 18. (T. at 237). She testified that she knew Appellant because she dated him from 2018 to 2019 and that during that time they lived together at 605 Waugh Street in Alliance, Ohio. (T. at 237-238). Julie E. testified that S.M. was 10 years old when she moved in with Appellant, and S.M. turned 12 right before they moved out. (T. at 238). Julie E. testified that during the time she lived with Appellant, S.M. never said anything about Appellant inappropriately touching her. (T. at 239).

**{¶15}** Julie E. testified that she recalled a conversation with Kaelyn Hill in the fall of 2021, where Kaelyn expressed concerns that Appellant had possibly sexually abused S.M. (T. at 239). Julie E. testified that she received this phone call from Kaelyn when she was travelling to Maryland, and when she heard the concerns, she told Kaelyn that she would call her back and then pulled over to a rest area. (T. at 239). Julie E. testified that at the rest area, she pulled S.M. into a bathroom and asked her if Appellant had ever touched her, and S.M. broke down crying. (T. at 240). She testified that she did not go into detail with S.M. because she wanted to make a police report first so those details would be included in the police report. (T. at 240). She testified that she then called the Alliance Police Department and made a report. (T. at 240).

**{¶16}** Julie E. testified that she was living in Maryland at the time she made the report but had since moved back to Ohio. (T. at 241). She stated that she cooperated with the investigation done by the Alliance Police Department and the investigation conducted by Children Services. (T. at 241). She testified that she scheduled a forensic interview with S.M. as well as a medical examination. (T. at 241-242).

{¶17} Julie E. testified that during the time she lived with Appellant, she did not see anything inappropriate or sexual in nature between S.M. and Appellant. (T. at 242). She testified that she did recall Appellant and S.M. camping outside in a tent on several occasions but did not think it was weird at the time. (T. at 242). She testified that on a few occasions, S.M. did not want to sleep in the tent outside and wanted to come inside with her. (T. at 243). She recalled that when S.M. did this, Appellant would get angry. (T. at 243). Julie E. testified that S.M. never told her or anyone else about any abuse that was taking place. (T. at 245).

{¶18} Julie E. testified that looking back she did notice some behavior changes with S.M., which included her soiling her pants, becoming isolated, cutting her arm, her grades dropping at school, and also that she began to see a counselor and started to take medication for anxiety and depression. (T. at 245-247).

{¶19} On cross-examination, Julie E. testified that when she confronted S.M. about the concerns in the bathroom of the rest area, she called Kaelyn Hill on the phone. (T. at 250). She also testified that the tent that S.M. and Appellant camped in was close to the house and specified that it was 3 or 4 feet away from the house in the side yard near the dining room window and basement door. (T. at 251). She stated that when Appellant and S.M. camped outside in the tent, she went outside a couple of times to check on them and did not see anything improper. (T. at 252). She admitted that she never checked on Appellant and S.M. in the shed. (T. at 252).

{¶20} The next witness to testify at trial was the victim, S.M. (T. at 268). S.M. testified that she was born July 11, 2007, and that her mother is Julie E. (T. at 270-271). S.M. testified that Appellant is her mother's ex-boyfriend, and that they started dating

when she was 9 or 10 and broke up when she was 12. (T. at 271). S.M. testified that she considers Appellant's biological daughters Kaelyn and Ryan as her sisters and that she still maintains a close relationship with Kaelyn, even though her mother and Appellant ended their relationship. (T. at 271-272).

**{¶21}** S.M. testified that she recalled her mother asking her in the Fall of 2021 if anything happened between her and Appellant, and in response she started crying. (T. at 272). S.M. testified that this conversation took place at a rest stop in the women's bathroom. (T. at 273). S.M. testified that after this conversation, a police report was made, she was interviewed and received a medical exam. (T. at 274).

**{¶22}** S.M. testified that Appellant would make her sleep with him in a tent in the side yard of their house or in a shed that he built in the backyard. (T. at 274). S.M. testified that Appellant began abusing her when she was 11 years old. (T. at 275). S.M. testified that the first incident occurred when they were camping in the yard in a tent, and Appellant started touching her and made her touch him. (T. at 267-277). S.M. testified that Appellant touched her over her clothes between the legs and made her touch him between his legs, at first over his clothes and then under his clothes. (T. at 277). S.M. testified that this happened in the tent 4 or 5 more times, and that Appellant also made her do stuff orally. (T. at 277).

**{¶23}** S.M. testified that Appellant made her put her mouth on his crotch, and his penis went inside her mouth. (T. at 278). S.M. also testified that Appellant put his penis inside her vagina. (T. at 278). S.M. testified that Appellant told her that he wanted to get her pregnant when this was happening, but S.M. also testified that Appellant was wearing a condom. (T. at 278). S.M. testified that Appellant would not have sexual intercourse

with her when she started dating someone or when there were too many people living in the house. (T. at 279). S.M. testified that during these incidents, Appellant would threaten to harm her parents, her brother, and even her dog if she told anyone about it. (T. at 280).

**{¶24}** S.M. recalled incidents which happened in the shed behind the house once or twice and also an incident which occurred in Appellant's room once. (T. at 280). S.M. testified Appellant made her perform oral sex on him in the shed, but that Appellant did not have sexual intercourse with her in the shed. (T. at 282).

**{¶25}** S.M. testified that an incident also occurred in Appellant's bedroom in the house when she was 12 years old. (T. at 283). S.M. testified that her mother was taking Kaelyn to work, and Appellant texted her to bring something up to him in his room. (T. at 283). S.M. testified that once she entered Appellant's room, Appellant told her to bend over the bed and he pulled her pants down and then had sexual intercourse with her. (T. at 284). She testified that she felt like she was being split in half and could not breathe due to the pain. (T. at 284). She testified that the last time Appellant had sex with her she was 12 years old, and that it occurred months before Appellant and her mother broke up. (T. at 284-285). She testified that the abuse has affected her mentally and physically, and that she has been diagnosed with PTSD, bipolar depression, and night terrors, and that she is currently on medication. (T. at 285).

**{¶26}** On cross-examination, S.M. testified that her mother was not FaceTiming with Kaelyn in the rest stop bathroom when she spoke to her about Appellant. (T. at 289). S.M. also testified that the tent that she camped in with Appellant was close to the house in the side yard near the basement door. (T. at 290). S.M. also testified that her mother

took Kaelyn to work when they lived together because her mother did not have a job. (T. at 294).

{¶27} The next witness to testify at trial was Detective William Johnson of the Alliance Police Department. (T. at 295). Det. Johnson testified that he primarily deals with cases involving abuse of children, and that he was assigned to investigate the sexual abuse allegations concerning S.M. in 2021. (T. at 296).

{¶28} Det. Johnson testified that there was a delay in the investigation because S.M. and her mother were living in Maryland, and that once they moved back to Alliance the investigation started. (T. at 297). Det. Johnson testified that he observed S.M.'s forensic interview via live video at the Children's Network. (T. at 299). Det. Johnson testified that S.M. disclosed during her forensic interview that Appellant was the perpetrator. (T. at 303). Det. Johnson testified that S.M. never identified any eye witnesses of the abuse. (T. at 306). Det. Johnson testified that he was able to corroborate details of S.M.'s story by talking to Kaelyn Hill. (T. at 306).

{¶29} Det. Johnson testified that through his investigation he became aware of Karla Lunde, who was Appellant's ex-girlfriend. (T. at 299). Det. Johnson testified that Ms. Lunde currently lives in New York, which is about a 7½ hour drive from Canton, OH. (T. at 300). Det. Johnson testified that when he initially interviewed Karla Lunde, she was cooperative and gave him a statement. (T. at 300). Det. Johnson testified that Karla Lunde told him that Appellant admitted to having sex with S.M. when he dated S.M.'s mother. (T. at 302-303).

{¶30} On cross-examination, Det. Johnson testified that his interview with Karla Lunde was over the telephone, and he was not able to observe her facial expressions.

(T. at 309). Det. Johnson testified that he recalled the forensic interviewer discuss with S.M. that S.M. was holding her cell phone during the interview. (T. at 311). Det. Johnson testified that in his experience as a law enforcement officer, he does not allow individuals to look at their cell phones during interviews. (T. at 312).

**{¶31}** The next witness to testify at trial was Alissa Edgein, a Nurse Practitioner at Akron Children's Hospital. (T. at 323).

**{¶32}** Prior to her testimony and outside the presence of the jury, Appellant objected to a portion of the notes from the Nurse Practitioner. (T. at 318). The trial court entered Court's Exhibit B1 as a copy of the nurse practitioner's notes that contained highlighted portions to which Appellant objected and requested to be redacted. (T. at 318-319). Appellant argued that the highlighted portions should not be included because they were not made for the purpose of medical diagnosis and/or were not relevant. (T. at 319). Many of the highlighted portions contained notes of things that Appellant said to S.M. during the alleged abuse. (T. at 319).

**{¶33}** Nurse Practitioner Edgein testified that she splits her time between the emergency department in Akron and the Children's Network in Stark County. (T. at 324). Ms. Edgein was deemed an expert witness in child sex abuse. (T. at 326). Nurse Edgein described the forensic interview and medical examination process at the Children's Network. (T. at 327-334). She testified that she performed a medical examination of S.M. following S.M.'s forensic interview at the Children's Network. (T. at 334). She testified that S.M. was brought to the Children's Network due to concerns that a previous boyfriend of her mother had sexually assaulted her. (T. at 334). Nurse Edgein testified that she asked

pre-interview questions to S.M.'s mother about behavioral changes because children have behavioral reactions to trauma. (T. at 336).

**{¶34}** During Nurse Edgein's examination, S.M. disclosed fondling, digital-vaginal penetration, oral-genital contact, and penile-vaginal penetration. (T. at 344). Nurse Edgein testified that S.M.'s physical examination was normal; however, this did not surprise her because the alleged abuse had occurred years prior. (T. at 339-340). She explained that because the genital area in females is made up of mucous membrane tissue, it heals quickly; thus, only "a very small percentage of patients that have been sexually abused have physical findings." (T. at 340-341). She testified that S.M. tested negative for any STD's. (T. at 341). Nurse Edgein read her report into the record, including her diagnosis which was child sexual abuse. (T. at 343-345).

**{¶35}** Following the testimony of Nurse Edgein, the State rested subject to the admission of its exhibits. (T. at 353). Appellant renewed his objection to State's Exhibit 2, which were the notes of Nurse Edgein from her medical exam. (T. at 355).

**{¶36}** Appellant then made a motion for acquittal pursuant to criminal rule 29, which was denied by the trial court. (T. at 356). Appellant then rested his case without presenting any evidence. (T. at 358).

**{¶37}** The trial court then proceeded to give the jury preliminary instructions, which were followed by closing arguments by the parties. (T. at 359-370).

**{¶38}** During the State's closing argument, the following statement was made by the prosecuting attorney:

> And lastly, I don't know how you could not believe her pure raw emotion that you saw on the stand today. She couldn't even come in this

room and look at this man without breaking down in tears facing her abuser. If you think she was faking that performance, then she certainly deserves an Oscar because that was the most genuine testimony I think we could have seen. (T. at 378).

{¶39} Appellant objected to this statement, and it was overruled by the trial court. (T. at 379).

{¶40} On the start of the second day of jury deliberations, the trial court heard evidence about potential misconduct by the jury and Appellant. (T. at 425). The trial court conducted an independent *voir dire* of each juror, all of whom denied engaging in any improper conduct. (T. at 433-465). After the independent *voir dire*, the State moved for a mistrial. (T. at 468). Appellant requested that the trial court deny the State's request for a mistrial. (T. at 468). The trial court denied the State's request to declare a mistrial. (T. at 477). The trial court then instructed the jury to continue its deliberations. (T. at 480). Approximately an hour and a half later, the jury indicated that it reached a verdict and found the Appellant guilty of the indicted charge. (T. at 482-483).

{¶41} On June 9, 2023, Appellant appeared before the trial court for a sentencing hearing. After affording the victim as well as the parties an opportunity to speak, the trial court sentenced Appellant to a mandatory sentence of ten (10) years to life in prison. (Sent. T. at 6-9).

{¶42} The trial court filed its Judgment Entry finding Appellant guilty on June 12, 2023, and filed its Judgment Entry imposing sentence on June 14, 2023.

{¶43} Appellant now appeals, raising the following errors for review:

ASSIGNMENTS OF ERROR

**{¶44}** "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION OF RAPE AGAINST APPELLANT UNDER 2907.02(A)(1)(b)(B), AND THE CONVICTION MUST BE REVERSED

**{¶45}** "II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AND MUST BE REVERSED.

**{¶46}** "III. THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

**{¶47}** "IV. THE APPELLANT WAS DENIED A FAIR TRIAL BY THE CUMULATIVE ERRORS BY THE TRIAL COURT."

**I., II.**

**{¶48}** In his first and second assignments of error, Appellant argues his conviction was against the manifest weight and sufficiency of the evidence. We disagree.

**{¶49}** The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus.

**{¶50}** The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶51} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, *supra*, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶52} A jury is free to accept or reject any and all of the evidence offered by the parties and assess the witness' credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP-739, *citing State v. Nivens* (May 28, 1996), Franklin App. No. 95APA09-1236.

{¶53} The trier of fact, in this case the jury, was vested with the authority to weigh the evidence and assess the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. Moreover, the jury was free to believe some, all, or none of the testimony of any witnesses. *Domigan v. Gillette* (1984), 17 Ohio App.3d 228, 229, 479 N.E.2d 291.

**{¶54}** Appellant herein was convicted of Rape, in violation of R.C. §2907.02(A)(1)(b), which states:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

\*\*\*

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

**{¶55}** Appellant argues that the testimony presented by the State was contradictory and failed to include and physical evidence. Appellant also argues that the State failed to prove beyond a reasonable doubt that he was not the spouse of the victim.

**{¶56}** Regarding Appellant's argument that the state failed to prove that S.M. was not his spouse, we find the State presented sufficient evidence that S.M. was not Appellant's spouse. *See State v. Muller*, 3d Dist. Defiance No. 4-11-09, 2012-Ohio-3530, ¶ 82 (" 'When the state fails to affirmatively ask the victim whether she was the spouse of the offender, [a trier of fact may] infer from the testimony or circumstances, if sufficient, that a defendant and his victim are not married.' "), quoting *State v. Rainey*, 2d Dist. Montgomery No. 23070, 2009-Ohio-5873, ¶ 30, *citing State v. Brown*, 8th Dist. Cuyahoga No. 86577, 2006-Ohio-4584, ¶ 13. Here, S.M. testified that Appellant was her mother's boyfriend. S.M.'s mother and Appellant's daughter Kaelyn testified likewise. Further, S.M. testified that she was between ten and twelve years old when the sexual abuse took place. The legal age to marry in Ohio is eighteen. R.C. § 3101.01. Marriage of persons under the statutory age is void in Ohio. We therefore find, to the extent that Appellant

argues lack of evidence or proof of the "not the spouse of the victim" element of the crimes, he cannot demonstrate prejudice because, based upon the stated age of his victim, she was not of marriageable age in the state of Ohio. *See* R.C. § 3101.01. There is no way that he could have asserted at trial that he was the spouse of S.M. *State v. Maddox*, 5th Dist. Stark No. 2021 CA 00072, 2022-Ohio-956, ¶ 51; *State v. Sloane*, 7th Dist. Mahoning No. 06 MA 144, 2009-Ohio-1175, ¶ 49;

{¶57} Based upon the testimony, we find sufficient evidence was presented to establish that S.M. was not the spouse of Appellant.

{¶58} Upon review of the record, we find S.M.'s testimony at trial was essentially uncontroverted and that her testimony alone, if believed, was sufficient to support Appellant's rape conviction. We have held that the testimony of one witness, if believed by the factfinder, is enough to support a conviction. *State v. Keller*, 5th Dist. Delaware No. 18CAA090075, 2019-Ohio-3857, ¶ 29, *appeal not allowed,* 157 Ohio St.3d 1538, 2020-Ohio-122, 137 N.E.3d 1206, *citing State v. Dunn*, 5th Dist. Stark No. 2008-CA-00137, 2009-Ohio-1688, ¶ 133; *State v. Jones*, 5th Dist. Tuscarawas No. 2020AP110024, 2021-Ohio-3682, ¶ 35.

{¶59} In addition to S.M.'s testimony, the jury also heard testimony, as set forth in detail above, from Appellant's daughter Kaelyn, S.M.'s mother, the investigating detective, and the nurse practitioner who conducted the forensic interview and medical examination.

{¶60} While some of the testimony may have been somewhat inconsistent, we do not find any substantial contradictions.

**{¶61}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

**{¶62}** Further, the resolution of conflicting evidence are matters for the finder of fact to resolve. The jury was free to accept or reject any and all of the evidence offered by the state and assess the credibility of the victims. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render [a] defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. McGregor*, 5th Dist. Ashland No. 15-COA-023, 2016-Ohio-3082, 2016 WL 2942992, ¶ 10, *citing State v. Craig*, 10th Dist. Franklin No. 99AP-739, 2000 WL 297252 (Mar. 23, 2000). Jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.*

**{¶63}** As set forth above, the jury heard and observed the victim and the other witnesses as each testified and had the opportunity to weigh their credibility accordingly. The jury also heard about the timing and circumstances surrounding the disclosure of the abuse and was free to weigh the matter as it saw fit.

**{¶64}** Our review of the entire record reveals no significant inconsistencies or other conflicts in the state's evidence which would demonstrate such a profound lack of credibility of any individual witness which would lead us to a conclusion the jury lost its way in weighing the evidence and credibility of the witnesses in reaching its verdict. Based

on the forgoing, we find Appellant's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶65} Appellant's first and second Assignments of Error are overruled.

### III.

{¶66} In his third assignment of error, Appellant argues that he was denied a fair trial due to prosecutorial misconduct. We disagree.

{¶67} In *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 109, the Ohio Supreme Court stated:

> If any misconduct occurred, the court must consider the effect it had on the jury "in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). With regard to each allegation of misconduct, we must determine whether the conduct was "improper, and, if so, whether [it] prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[A] defendant's substantial rights cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously." *State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578, 957 N.E.2d 866, ¶30 (8th Dist.2011), *citing State v. Williams*, 38 Ohio St.3d 346, 349–350, 528 N.E.2d 910 (1988).

{¶68} Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact, which we review *de novo. United States v. Carson*, 560 F.3d 566, 574 (6th Cir.

2009) *citing United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999) *citing United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993).

**{¶69}** Appellant identifies several instances which he asserts arise to prosecutorial misconduct and otherwise deprived him of his due process rights due to: (1) testimony regarding Appellant's time in prison (2) improper vouching for the victim's credibility by a witness, and (3) improper vouching for the victim's credibility during closing arguments.

**{¶70}** To address these arguments, we must first determine: (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected Appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The inquiry is guided by four factors: (1) the nature of the remarks; (2) whether an objection was made by counsel; (3) whether corrective instructions were given by the court; and (4) the strength of the evidence against the defendant. *Sidney v. Walters*, 118 Ohio App.3d 825, 829, 694 N.E.2d 132 (3d Dist.1997).

**{¶71}** Reversal is warranted where the improper statements "pervade the trial to such a degree that there was a denial of due process." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). When making this determination, we must consider the effect of any misconduct in the context of the entire trial. *Id.* "The touchstone of this analysis is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶72}** First, Appellant argues that "despite [his] motion *in limine*, the State presented evidence of Appellant's prison sentences." (Appellant's Brief at 23). Appellant is referring to an exchange which took place on cross-examination when counsel for

Appellant asked Appellant's daughter Kaelyn if she camped a lot with Appellant growing up. Kaelyn responded by stating that Appellant was in prison a lot. (T. at 229). The trial court had previously ruled that this type of evidence would not be permitted during trial. (T. at 6-9).

{¶73} As presented above, the State did not elicit this testimony. Instead the question was asked by Appellant's counsel on cross-examination. Further, the trial court ordered Kaelyn's statement stricken from the record.

{¶74} The invited error doctrine provides that "a party is not permitted to take advantage of an error that he himself invited or induced the court to make." *Davis v. Wolfe*, 92 Ohio St.3d 549, 552, 751 N.E.2d 1051 (2001). The doctrine of invited error precludes a defendant from making an affirmative and apparent strategic decision at trial and then complaining on appeal that the result of that decision constitutes reversible error. *State v. Wilson*, 5th Dist. Muskingum No. CT 2019-0039, 2020-Ohio-1217, ¶ 20; *See also State v. Doss*, 8th Dist. Cuyahoga No. 84433, 2005-Ohio-775, ¶ 7, *quoting United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir. 2003).

{¶75} Appellant next argues that during the trial the State improperly attempted to bolster the testimony of S.M. Appellant cites to the testimony of Kaelyn Hill, wherein Ms. Hill was asked by the State if she had any reason not to believe S.M. Appellant objected and the trial court sustained the objection. (T. at 235). Ms. Hill was then immediately asked by the State if S.M. ever did anything to suggest that she was lying. Appellant again objected and the trial court likewise sustained the objection. (T. at 235).

{¶76} It is well-established that juries are presumed to follow and obey the limiting instructions given them by the trial court. *State v. Davis*, 5th Dist. Richland No. 14 CA 34,

2015-Ohio-889, 31 N.E.3d 1204, ¶ 54, *citing State v. DeMastry*, 155 Ohio App.3d 110, 127, 799 N.E.2d 229, 2003-Ohio-5588, ¶ 84; *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991); *Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "A presumption always exists that the jury has followed the instructions given to it by the trial court." *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), at paragraph four of the syllabus, rehearing denied, 54 Ohio St.3d 716, 562 N.E.2d 163. A curative instruction is presumed to be an effective remedy for the introduction of improper statements during the course of a trial. *See State v. Zeurn*, 32 Ohio St.3d 56, 61, 512 N.E.2d 585 (1987). Moreover, a jury is presumed to follow the court's curative instructions concerning improper comments. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 93 (stating that the jury can be presumed to have followed the court's instructions to disregard testimony).

**{¶77}** Lastly, Appellant argues that the prosecutor engaged in misconduct during closing arguments by making the following statement:

> And lastly, I don't know how you could not believe her pure raw emotion that you saw on the stand today. She couldn't even come in this room and look at this man without breaking down in tears facing her abuser. If you think she was faking that performance, then she certainly deserves an Oscar because that was the most genuine testimony I think we could have seen.

**{¶78}** (T. at 378-379).

**{¶79}** " 'A prosecutor may comment upon the testimony and suggest the conclusion to be drawn by it, but a prosecutor cannot express his personal belief or

opinion as to the credibility of a witness or as to the guilt of an accused, or go beyond the evidence which is before the jury when arguing for conviction.' " *State v. Manns,* 5th Dist. Richland No. 08 CA 101, 2009-Ohio-3262, 2009 WL 1900432, ¶ 20, *citing State v. Smith,* 12th Dist. Butler No. CA2007-05-133, 2008-Ohio-2499, 2008 WL 2168427, ¶ 7. *See also State v. Stober,* 3d Dist. Putnam No. 12-13-09, 2014-Ohio-1568, 2014 WL 1464226, ¶ 133, *citing State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 16.

**{¶80}** For example, a prosecutor "can bolster his own witnesses, and conclude by saying, in effect, 'The evidence supports the conclusion that these witnesses are telling the truth.' " *State v. Draughn,* 76 Ohio App.3d 664, 670, 602 N.E.2d 790 (5th Dist.1992). *See also State v. Jeffery,* 2d Dist., 2013-Ohio-504, 986 N.E.2d 1093, ¶ 20, *citing Draughn.* However, a prosecutor "cannot say, 'I believe these witnesses,' because such argument invades the province of the jury, and invites the jury to decide the case based upon the credibility and status of the prosecutor." *Draughn* at 670, 76 Ohio App.3d 664, 602 N.E.2d 790, *citing State v. Smith,* 14 Ohio St.3d 13, 470 N.E.2d 883 (1984). *See also Jeffery* at ¶ 20, *citing Draughn.*

**{¶81}** Here, upon review, while we find the prosecutor's statements to be troublesome, the trial court instructed the jury that closing arguments were not evidence and that the jury should not speculate on why the court sustained any objection. This limited the potential for prejudice from any misconduct. *State v. Dean,* 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶¶ 250, 253.

**{¶82}** While we find that the prosecutor's statements were improper, we do not find that such rises to prejudicial error.

**{¶83}** Appellant's third assignment of error is overruled.

**IV.**

**{¶84}** In his fourth assignment of error, Appellant argues that he was denied a fair trial due to the cumulative errors by the trial court. We disagree.

**{¶85}** In *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, the Supreme Court of Ohio recognized the doctrine of cumulative error. Under the doctrine of cumulative error, "[s]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together." *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, 2004 WL 1506227, ¶ 40, *citing State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). "In order to find cumulative error, we first must find that multiple errors were committed at trial." *Id.*

**{¶86}** In the instant case, we do not find multiple instances of harmless error triggering the cumulative-error doctrine. Where we have found that the trial court did not err, cumulative error is simply inapplicable. *State v. Carter*, 5th Dist. Stark No. 2002CA00125, 2003-Ohio-1313, 2003 WL 1258150, ¶ 37.

**{¶87}** Additionally, we note that while Appellant attempts to argue here as part of the cumulative error argument that the trial court erred in admitting into evidence State's Exhibit B1, which was a copy of the nurse practitioner's notes which contained highlighted portions to which Appellant objected and requested to be redacted, he has not raised a separate assignment of error or advanced an argument as to this issue.

**{¶88}**  Appellant's fourth assignment of error is overruled.

**{¶89}**  For the reasons stated in the foregoing opinion, the decision of the Stark County Common Pleas Court is affirmed.


By: Wise, J.

Delaney, P. J., and

Hoffman, J., concur.


JWW/kw 0430