[Cite as *State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   95133

## THE STATE OF OHIO,

APPELLEE,

v.

## HICKS,

APPELLANT.

## JUDGMENT:
## REVERSED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-528016

**BEFORE:**   Boyle, J., Kilbane, A.J., and Stewart, J.

**RELEASED AND JOURNALIZED:**   July 21, 2011

William D. Mason, Cuyahoga County Prosecuting Attorney, and Daniel A. Cleary, Assistant Prosecuting Attorney, for appellee.

David L. Doughten, for appellant.

MARY J. BOYLE, Judge.

**{¶ 1}** Defendant-appellant, Joaquin Hicks, appeals his conviction and sentence. Finding merit to the appeal, we reverse the judgment, and we remand the case for a new trial.

## Procedural History and Facts

**{¶ 2}** In September 2009, Hicks was indicted on eight counts. Specifically, he was charged with one count of aggravated murder, in violation of R.C. 2903.01(A); two counts of aggravated murder, in violation of R.C. 2903.01(B); two counts of kidnapping, in violation of R.C. 2905.01(A)(2); two counts of aggravated robbery, in violation of R.C. 2911.03(A)(1) and (A)(3); and one count of attempted murder, in violation of R.C. 2923.02(A). The counts included felony-murder, mass-murder, firearm, notice-of-prior-conviction, and repeat-violent-offender specifications. Hicks pleaded not guilty to all the charges.

**{¶ 3}** Prior to trial, the state moved to dismiss the capital specifications, i.e., the felony-murder and mass-murder specifications. The defense also moved to bifurcate the

repeat-violent-offender specifications, having the matter tried to the bench, and stipulated to Hicks's prior convictions. The trial court granted both motions, and the matter proceeded on the remaining charges before a jury.

{¶ 4} We summarize the following facts from the evidence presented at trial. We will discuss the facts further in our disposition of the stated assignments of error.

{¶ 5} The charges arise out of the fatal shooting of Jeremy Pechanic and the shooting of Jory Abely in Perk Park, across from Scorchers bar in downtown Cleveland, during the early morning hours of February 22, 2009. The events leading up to the shootings began with Jeremy and Jory meeting friends downtown to celebrate the birthday of a friend and coworker, Chauna Whitlow. Although the party started at another bar during the evening of February 21, the group — Jeremy, Jory, Chauna, and two other friends, Stacey Donaldson and Tenette White, eventually decided to go to Scorchers. They arrived at Scorchers around midnight and remained there until the bar closed at 2:30 a.m. Stanley Donaldson, Stacey's brother, met them there along with one of his friends, Myrt Price.

{¶ 6} While at Scorchers, a man identified as being black, in his 20s to 30s, wearing a "skull cap" and a navy and black jacket with a red shirt underneath, who referred to himself as "Daquan," approached the group's table on several occasions, trying to engage in conversation.[1] According to some of the witnesses, Daquan was

---

[1] Although some of the witnesses interviewed gave differing names, Cleveland police homicide detectives assigned to the case testified that the most consistent pronunciation of the

especially friendly with Jeremy, who had, at certain points throughout the night, left the table to socialize with other people, including Daquan. The two had gone outside together to smoke and Jeremy had bought Daquan at least one drink. Stanley Donaldson testified that he ultimately asked Daquan to leave the group alone, finding him to be suspicious. According to Stanley, Daquan appeared to be homeless and trying to scam the group for free drinks and money.

{¶ 7} At some point, Daquan and Jeremy had gone outside where Daquan shared a marijuana cigarette with Jeremy. According to Rodney Rhines, who came upon Daquan and Jeremy outside smoking, he heard them discussing marijuana—Daquan told Jeremy that he could get him a quarter ounce of marijuana for $200. Rhines also learned that Daquan had just been released from prison after serving a lengthy sentence.

{¶ 8} The three then went inside the building in search of an ATM machine, where Jeremy withdrew $260 in cash. According to Rhines's testimony, immediately after withdrawing the cash, Jeremy suspected that Daquan had stolen his ATM card and began to push him. Jeremy, however, quickly found his card, gave Daquan $20, and then returned inside the bar where he bought all three of them a drink.

{¶ 9} Thereafter, according to codefendant Cornelius King, Daquan approached his table, where he was seated with his cousin, Reginald Day, and his brother, Perry King.

---

suspect's name provided by the witnesses was "Daquan." We further note that not all of the state's witnesses knew the suspect's name. For the sake of clarity, we refer to the suspect as Daquan in the recitation of the facts, even in reference to those witnesses who did not know his name but were clearly referring to the same suspect.

Their table was located near the birthday group. Cornelius testified that Daquan approached Reginald and stated that "two white guys were interested in buying some drugs." This, in turn, escalated to Cornelius deciding that he, Perry, and Reginald should rob the "white guys" under the guise of a drug transaction and eliciting the help of the Kings' younger brother, Ralfeal, who had a gun and previous experience with robberies. Using Day's cell phone, Cornelius called Ralfeal and told him to come downtown and to bring his gun.

{¶ 10} Jory testified that Jeremy had told him that he "smoked up" outside of Scorchers and that he was trying to purchase more marijuana. Jory cautioned Jeremy to be careful. At closing time, Jeremy exited the bar with Jory. According to Jory, while outside, a man wearing red approached Jeremy and stated, "I got the stuff for you." (This man is the same individual identified as Daquan by the other witnesses.) Jory further testified that this man gave him a dirty look when Jory tried to talk Jeremy out of buying any drugs from him.

{¶ 11} Jeremy and Jory ultimately ended up in Perk Park across the street from Scorchers, along with Cornelius, Perry, Reginald, and Daquan. They were met there by Ralfeal, who pulled a gun on Jeremy and Jory. Jory testified that someone in the group demanded money, which Jeremy voluntarily turned over, saying, "Here, take it." Ralfeal, the shooter, then responded by saying, "Take this," shooting Jeremy first in the

chest and then a second time, causing Jeremy to fall to the ground. Jory next remembers being ordered to kneel on the ground. Ralfeal then shot him in the back of his head.

{¶ 12} Jeremy died as a result of the shooting. Jory survived but sustained a serious brain injury, causing him to suffer from a condition called prosopagnosia, which prevents him from recognizing someone based upon the person's facial features.

{¶ 13} Three days following the shooting, Cornelius, Perry, and Reginald turned themselves into the police station, initially lying as to their involvement in the offenses. They, along with Ralfeal, were all arrested and charged with aggravated murder, which carried the possibility of the death penalty.

{¶ 14} Cleveland police detectives Raymond Diaz and Ignatius Sowa testified as to their extensive investigation, which included, among other things, interviewing numerous witnesses and identifying the suspect most consistently referred to as "Daquan." The police believed that this man, i.e., Daquan, orchestrated the robbery, which ultimately resulted in the shootings of the victims. Based on the information provided by Rodney Rhines, who indicated that the suspect had told him that he had just been released from prison two days earlier after a lengthy sentence, Detective Sowa sent a subpoena to the Ohio Department of Rehabilitation and Correction, seeking a list of all the inmates released from prison during the month of February 2009. From the list provided, the detectives identified Joaquin Hicks as a possible suspect based on his release date, his county of residence, term of imprisonment, and the nature of his offenses, i.e., aggravated

robbery. Hicks also has the middle name of "Taa-Rhan," which the detectives thought he might have used but was misheard as "Daquan." In August 2009, they pulled a picture of Hicks and compiled a photo array and presented it to various witnesses, including Rodney Rhines and Stanley Donaldson. Donaldson positively identified Hicks as being Daquan in the photo array and one of the individuals he saw leaving the park immediately following the shooting.

*State's Case: Hicks is Daquan*

{¶ 15} At trial, the state's theory was that Hicks is the same person as Daquan—the person responsible for facilitating the robbery and delivering Jeremy and Jory to Perk Park where Ralfeal was waiting for them with a firearm. The state's case primarily hinged on eyewitness identification. In addition to Stanley Donaldson's photo-array and in-court identification of Hicks as the suspect, the state presented the testimony of Cornelius, Rhines, and Tenette White—all of whom made in-court identifications of Hicks as being Daquan. The state also argued that Hicks's recent release from prison and the similarity of his middle name to Daquan correlated with facts describing the suspect. The state further presented testimony to discredit Hicks's alibi, establishing that Hicks sent a text message to Amber Pollard during the time that the two were allegedly taking a bath together.

*Defense's Case: Misidentification*

{¶ 16} In contrast, Hicks maintained that the state was prosecuting the wrong person—that he was not at Scorchers on February 22, 2009, that he had an alibi for the time period in question, and that—based on the testimony of the defense's eyewitness expert—the witnesses' identification of him was not reliable. Specifically, Hicks testified that he had never been to Scorchers after being released from prison on February 19, 2009. According to Hicks, on February 21, 2009, he called Amber Pollard, a romantic interest and friend, to come over to his aunt's house. She came over later in the evening and the two took a long bath together, then had sex, and eventually fell asleep. He testified that he did not leave his aunt's house at all on the evening of February 21 or on the 22; instead, he left the residence on February 23 when he had to go see his parole officer.

{¶ 17} Through the presentation of 11 defense witnesses, including Hicks, the defense presented a picture that Hicks was welcomed home by his family and friends and that as soon as he arrived home to his aunt's house, there was a constant flow of visitors celebrating Hicks's release from prison. (At age 18, Hicks was sent to prison and served ten years for felonious-assault and aggravated-robbery counts.) The defense further established that Hicks had an inheritance of approximately $21,000 waiting for him and that in addition to the money that he received upon being released from prison, relatives gave him money as well as clothes to help him start his new life. These witnesses consistently testified as to their interaction with Hicks starting on Thursday, February 19,

2009—the day that he was released—continuing into the weekend and ending on Sunday, February 22, 2009. These witnesses corroborated Hicks's testimony, including the fact that Hicks and Pollard were in the bathtub together at some point during the evening of February 21, and that Hicks had never left his aunt's house on Saturday evening.

{¶ 18} In addition to the ten alibi witnesses, the defense presented the testimony of Jacquelyn Mancuso, a server working at Scorchers on the evening of February 21, 2009, and early morning hours of February 22. Mancuso testified that Daquan was at Scorchers on February 21, 2009—a fact that she shared with the police within 24 hours of the shooting—but that Hicks was not Daquan.

*Jury's Verdict and Sentencing*

{¶ 19} The jury found Hicks not guilty of aggravated murder, as contained in counts one, two, and three of the indictment, but guilty of the lesser included offense of murder, in violation of R.C. 2903.02(B). The jury further found Hicks guilty on all the remaining five counts. The trial court separately found Hicks guilty as to the notice-of-prior-conviction and repeat violent-offender specifications. The trial court subsequently sentenced Hicks to a total of 61 years to life in prison.

{¶ 20} Hicks appeals, raising the following eight assignments of error:

{¶ 21} "[I.] The prosecutor's accusation that defense counsel falsely manufactured the alibi defense in front of the jury deprived the defendant of a fair trial."

{¶ 22} "[II.] The trial court erred in allowing a state witness to hypothesize why the appellant acted as he did."

{¶ 23} "[III.] The trial court erred by overruling the defense motion challenging the state's exercising of peremptory challenges of African-American jurors."

{¶ 24} "[IV.] The trial court erred by overruling a defense motion to dismiss a prospective juror for cause."

{¶ 25} "[V.] The trial court erred by failing to hold a hearing to determine whether the jury's verdict was tainted by an outside influence."

{¶ 26} "[VI.] The convictions are against the manifest weight of the evidence."

{¶ 27} "[VII.] The actions of counsel deprived the appellant of his right to effective assistance of counsel."

{¶ 28} "[VIII.] The trial court erred by sentencing the appellant to consecutive sentences without making a complete record of its findings as required by R.C. 2929.14(E)."

## Fair Trial

{¶ 29} In his first assignment of error, Hicks argues that the prosecutor's accusation that defense counsel falsely manufactured the alibi defense—made in front of the jury—deprived him of a fair trial.

{¶ 30} The test for prosecutorial misconduct is whether the prosecutor's remarks or questions were improper, and if so, whether they prejudicially affected substantial rights

of the accused. *State v. Treesh* (2001), 90 Ohio St.3d 460, 480-481, 739 N.E.2d 749. The focus of that inquiry is on the fairness of the trial, not the culpability of the prosecutor. *State v. Bey (1999)*, 85 Ohio St.3d 487, 493, 709 N.E.2d 484. Indeed, "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *United States v. Hasting* (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96. Therefore, our duty is to consider the trial record and to determine whether Hicks's substantial rights were violated, thereby depriving him of a fair trial. We note, however, that a defendant's substantial rights cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously. *State v. Williams* (1988), 38 Ohio St.3d 346, 349-350, 528 N.E.2d 910.

{¶ 31} Hicks specifically complains of the following question posed by the prosecutor during the state's cross-examination of defense eyewitness-expert Dr. Solomon Fulero:

{¶ 32} "[Prosecutor]   Would it surprise you to learn, in dealing with memory, that this attorney out there was standing with a bunch of different witnesses — .

{¶ 33} "[Defense counsel] Ms. Passalaqua: Objection, your Honor.

{¶ 34} "[Defense counsel] Mr. Paris: Objection.

{¶ 35} "The Court: Overruled.

{¶ 36} "[Prosecutor] Was standing with a bunch of different witnesses telling them what to testify to?

{¶ 37} "[Defense counsel] Ms. Passalaqua: Objection, your Honor. It is not true.

{¶ 38} "The Court: Okay.

{¶ 39} "[Defense counsel] Ms. Passalaqua: This is my ticket, Judge, and that is a blatant lie."

{¶ 40} Immediately following defense counsel's response, the judge called the counsel to sidebar where he admonished defense counsel for her reaction to the prosecutor's question. The trial judge further warned defense counsel that if she did not calm down, he was going to hold her in contempt. The trial court reiterated that the objection was overruled and told the prosecutor to ask the next question.

{¶ 41} Contrary to the state's contention, we find the questions to be improper and that any prejudice created by the questions was further enhanced by the trial court's failure to sustain the defense counsel's objection and provide a curative instruction to the jury.

{¶ 42} Under Evid.R. 611(B), cross-examination shall be permitted on all relevant matters and matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear

showing of an abuse of discretion." *State v. Acre* (1983), 6 Ohio St.3d 140, 145, 451 N.E.2d 802. But "[i]t is improper for an attorney, under the pretext of putting a question to a witness, to put before a jury information that is not supported by the evidence." *State v. Smidi* (1993), 88 Ohio App.3d 177, 183, 623 N.E.2d 655. And "[p]rosecutors must avoid insinuations and assertions calculated to mislead." *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293.

{¶ 43} Here, the state contends that these questions were proper because it was posed to an expert witness in the field of memory and that "an attorney telling a witness what to testify about would affect a person's memory." But aside from the fact that it was improper for the prosecutor to make such an accusation in the presence of the jury, there was absolutely no evidence that defense counsel engaged in such misconduct. See *State v. Davis* (Apr. 18, 2002), 10th Dist. No. 01AP-579 (reversing murder conviction and remanding for a new trial where prosecutor's cross-examination of appellant assumed facts that were not in evidence and insinuation was prejudicial, especially given that state's case was largely circumstantial and conflicted in various respects). Notably, the prosecutor never raised any concern with the court outside the presence of the jury as to his belief that the defense counsel was improperly telling the defense witnesses what to say. Nor did the prosecutor ever offer any evidence in support of this serious allegation. We find that the questions wrongfully impugned the credibility of the defense counsel

and improperly implicated the credibility of the defense witnesses offered in support of Hicks's alibi.

{¶ 44} We now turn to the critical question whether this line of questioning deprived Hicks of a fair trial. According to the state, Hicks's substantial rights were not violated because the evidence against him was overwhelming. Specifically, the state relies on the four identifications made of Hicks and the fact that there was at least one inconsistency in Hicks's alibi—i.e., a text message sent from Pollard during the time that Hicks was allegedly taking a bath with her. We find the state's argument, however, unpersuasive.

{¶ 45} This is not a case in which the evidence against Hicks was so overwhelming that it constitutes Hicks's guilt and the outcome of the case would have been the same regardless of the prosecutor's improper questioning and the trial court's failure to sustain the objection. To the contrary, the evidence presented at trial conflicted in various respects, and there was no physical evidence that directly linked Hicks to any of the offenses. Indeed, many of the state's witnesses who were at Scorchers or in the area could not positively identify Hicks as being the suspect, i.e., Daquan. As for the identifications made of Hicks, only one of the witnesses, namely, Stanley Donaldson, identified Hicks as the perpetrator prior to trial, in a photo array conducted in August 2009. But Stanley could not identify Hicks in a live lineup conducted in September 2009 and picked another individual instead. The other three identifications were all

made during trial while the defendant was seated at the defense table next to his attorneys. Notably, Rhines was presented with a photo array containing Hicks's picture in August 2009, but he could not identify Hicks.

{¶ 46} Further, while the majority of the eyewitnesses' descriptions of the suspect's clothing was consistent among those who identified Hicks at trial, i.e., red sweatshirt, dark coat, and skull cap, their testimony as to his actual physical appearance on the date of the offenses varied. For example, Rhines, who admitted to being a crack addict and was seeking his next "score" at the time of the incident, described the suspect as having short hair, a mustache, and "very light" hair under his lower lip, referring to it as a goatee. He specifically stated that the suspect did not have a scruffy beard. Conversely, Stanley Donaldson testified that the suspect, i.e., Daquan, had a full beard that was not groomed. And Tenette White, despite identifying Hicks at trial as the suspect in question, could not recall his physical features, such as his hair line under his skull cap or whether he had facial hair.

{¶ 47} Likewise, codefendant Cornelius King, who did not know the suspect prior to the incident, positively identified Hicks at trial but conceded that he could not remember what Hicks was wearing the night of the offense. Cornelius acknowledged that he did not look at him that much and did not remember ever speaking to him. Cornelius also admitted to getting high before going to Scorchers and consuming several

beers—both of which are factors that affect a person's memory, according to the eyewitness expert testimony presented at trial.

{¶ 48} These noted inconsistencies or flaws among the state's witnesses, however, are distinct and in addition to the completely contrary evidence presented by the defense. For example, aside from Hicks's testimony and his ten alibi witnesses—all of whom placed Hicks at his aunt's house and nowhere near Scorchers at the time of the offense—Mancuso's testimony established that Hicks was not Daquan. (Notably, Mancuso was completely unrelated to Hicks and had no apparent bias or motivation to testify on his behalf.) She further testified that having worked at Scorchers since August 2008, she knew Daquan as a "hustler" who frequented Scorchers periodically and that "Daquan," a.k.a. "Quan," was at the bar on February 21, 2009—not Hicks. Given that Hicks had been in prison for the last ten years, he could not have been the person whom Mancuso knew as Quan and saw periodically in Scorchers. Further, Mancuso's description of Daquan was very similar to the description provided by Stanley Donaldson, which included that he had pockmarks or bumps around his nose. But as evidenced by Hicks's prisoner-release identification card, and even conceded by Detective Sowa, Hicks did not have any visible bumps or pockmarks on his nose.

{¶ 49} Similarly, while the state's witnesses consistently testified that Daquan had some hair, albeit short, all the defense witnesses—who knew Hicks and saw him on

February 21, 2009—testified that he was bald, consistent with the way he looked in his prisoner-release identification card taken ten days before he was released.

{¶ 50} Here, given that the state's case hinged primarily on the eyewitness-identification testimony—evidence that was highly contested at trial by defendant and his alibi witnesses—the jury's decision came down to a weighing of the credibility of the witnesses. Thus, this is not a case in which the state's evidence is so overwhelming that we could otherwise ignore the improper attack on the credibility of the defense counsel. Indeed, the core of Hicks's defense rested on his credibility and the credibility of his alibi witnesses. And, therefore, the unsupported insinuation that defense counsel coached defense witnesses to lie directly affected Hicks's entire defense, thereby depriving him of a fair trial. See *Davis*, 202 WL 576077, citing *State v. Hunt* (1994), 97 Ohio App.3d 372, 375, 646 N.E.2d 889 ("where the core of the case rests with the credibility of the defendant and witnesses, the prosecutor's conduct was prejudicial and deprived appellant of a fair trial"). And, we note again that any prejudice caused to Hicks by the insinuation that defense counsel coached Hicks's alibi witnesses to lie was further heightened by the trial court's failure to sustain the objection and provide a curative instruction. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (trial court's failure to sustain an objection and provide curative instruction gives prosecutor's comment its approval in the jury's eyes).

{¶ 51} Accordingly, we conclude that Hicks's substantial rights were violated, thereby depriving him of a fair trial.   The first assignment of error is sustained.

{¶ 52} Having sustained this assignment of error, we find that the remaining assignments of error are moot.

Judgment reversed

and cause remanded.

KILBANE, A.J., and STEWART, J., concur.