[Cite as *State v. Neff*, 2026-Ohio-534.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO,

    Plaintiff - Appellee

-vs-

KRISTIN L. NEFF

    Defendant - Appellant

Case No. 2025CA0018

<u>Opinion And Judgment Entry</u>

Appeal from the Coshocton County Court of Common Pleas, Case No. 24 CR 0031

Judgment:   Affirmed

Date of Judgment Entry: February 17, 2026

**BEFORE:** Craig R. Baldwin; Kevin W. Popham; David M. Gormley, Judges

**APPEARANCES:** CHRISHANA L. CARROLL, Assistant Prosecuting Attorney, for Plaintiff-Appellee; CHRISTOPHER BAZELEY, for Defendant-Appellant.

*Baldwin, P.J.*

{¶1} The appellant appeals the jury's verdict finding her guilty on one count of endangering children. Appellee is the State of Ohio.

**STATEMENT OF FACTS AND THE CASE**

{¶2} On August 10, 2021, at approximately 2:00 p.m., C.U. dropped her fifteen-month-old daughter G.Y. off at the home of her babysitter, appellant Kristin L. Neff. Other than some slight fussiness due to teething, G.Y. was healthy and was behaving normally when dropped off at the appellant's home. One of G.Y.'s family members, K.D.R., also has a child for whom the appellant provided childcare. K.D.R. came to the appellant's home between 2:30 – 3:00 to pick up his child and spent time with G.Y., who appeared to him to be healthy and behaving normally.

{¶3} Emergency medical services received a call around 7:47 p.m. regarding a non-responsive baby at the home of the appellant's boyfriend's mother, M.M., whose home is adjacent to that of the appellant. EMS medics arrived, and CPR was in progress, but G.Y. showed no signs of life. G.Y. was transported to Coshocton County Hospital, where she was pronounced dead at 8:39 p.m.

{¶4} The coroner initially ruled that G.Y.'s death was the result of multiple instances of blunt force trauma, and that her death was accidental. However, after attending a medical seminar in May of 2023 at which a similar case study was presented, and after learning that G.Y. was not yet walking independently at the time of her death, the coroner amended his ruling and determined that G.Y.'s death was non-accidental.

{¶5} On March 15, 2024, the appellant was indicted on one count of Endangering Children in violation of R.C. 2919.22(A), a felony of the third degree. The appellant pleaded not guilty, and the matter was scheduled for trial.

{¶6} On July 9, 2025, prior to trial, the appellee filed a Motion in Limine to Include Specific Acts and Notice of Intent to Offer Same regarding the admission or exclusion of evidence relating to the appellant's activities, conduct, and movements in the hours prior to G.Y.'s death to show how and why she failed to protect G.Y. The evidence appellee sought to admit involved cell phone data that had been extracted from the appellant's cell phone, including text messages with her boyfriend and cell phone data showing the appellant's steps, or movements, during the hours preceding G.Y.'s death. The appellant filed a brief in opposition to the admission of said evidence. On July 23, 2025, the trial court conducted a hearing on the appellee's Motion, and issued a Judgment Entry with a preliminary ruling that the appellee could proffer the evidence at trial.

{¶7} On July 16, 2025, the appellant filed a Motion in Limine to Exclude Use of Autopsy and Life Media in which she sought to exclude the autopsy photographs, arguing that they were too graphic and unfairly prejudicial; and, sought to exclude any media of G.Y. while alive, arguing that any such evidence was irrelevant. The trial court heard arguments on this Motion during the July 23, 2025, hearing. The court denied the appellant's Motion at the conclusion of the hearing, stated that it would allow the evidence but assumed the appellee would pick an appropriate number, and stated that it would limit the presentation of the number of photographs if necessary.

{¶8} The matter proceeded to trial on August 11, 12, 13, and 14, 2025. C.U. testified that she dropped G.Y. off at the appellant's home around 2:00 p.m. C.U. testified further that, other than G.Y.'s fussiness due to teething, G.Y. was healthy and normal in both behavior and appearance.

{¶9} K.D.R. testified that he was at the appellant's home between 2:30 – 3:00 to pick up his child, that he spent time with G.Y., and that G.Y. appeared to be healthy and was behaving normally.

{¶10} Coshocton County EMS paramedic Darin Fandrey testified that he responded to the 911 call regarding an unresponsive infant who was not breathing. Upon arrival at the scene, Fandrey observed another paramedic who had also arrived on the scene performing chest compression on G.Y. However, G.Y. was showing no cardiac activity. Paramedics continued to perform CPR and gave G.Y. two doses of epinephrine to increase coronary activity. However, G.Y. was pronounced dead after arriving at the hospital.

{¶11} Detective Tyler Mann of the Coshocton County Sheriff's Office testified that both law enforcement and JFS were notified following G.Y.'s death. Detective Mann interviewed the appellant a number of times. The appellant stated during her first interview that G.Y. napped around 4:00 p.m., after K.D.R. picked up his child, and that after waking G.Y. up from her nap the appellant tried to feed G.Y., but G.Y. would not eat and went back to sleep. The appellant told Detective Mann that at some point, she believed around 6:30 p.m., G.Y. vomited, and that she notified G.Y.'s mother via text at 7:28 p.m. regarding G.Y.'s condition. The appellant told Detective Mann that her son told her that G.Y. "didn't look right," so the appellant went to her boyfriend's mother M.M.'s home, which was adjacent to the appellant's home, to seek M.M.'s opinion. The appellant told Detective Mann that M.M. immediately picked G.Y. up and took her to the porch, and the appellant used M.M.'s phone to call 911. The appellant was interviewed a second time, during which she stated numerous times that she never left G.Y. alone; stated multiple times how small her home was, and that she would have seen or heard if something had happened to G.Y. while in her care; and, repeated that she had no explanation for the injuries sustained by G.Y., stating that G.Y. did not fall because she was not fully ambulatory and there had been no other accidents.

{¶12} The appellant was interviewed for a third time by Bryant Garrison, who was at the time of the interview the Chief Deputy with the Coshocton County Sheriff's Office and held the rank of Captain. Garrison testified that the appellant admitted to him that she had smoked marijuana on the day of G.Y.'s death, specifically that she "smoked a bowl" of marijuana sometime that morning. She stated that she did not smoke around the children, and that she smoked marijuana for her nerves. Garrison testified that the

appellant told him she believed she was getting sick, but aside from going to the restroom, when one of her kids sat with G.Y., she never left G.Y. alone. Garrison testified that the appellant voluntarily provided law enforcement with her cell phone, and the passcode to gain access to the device. Deputy Alan Thomas testified that he utilized Cellebrite software to conduct a "phone dump" of the appellant's cell phone.

{¶13} Agent JoAnn Gibb, a BCI forensic analyst, testified regarding her use of the Cellebrite reader program as part of her duties, and that she had reviewed the Cellebrite reports provided by deputies regarding the appellant's cell phone. Agent Gibb testified that she reviewed both the text data and health app data as logged on the appellant's phone, and testified regarding the text activity on August 10, 2021, and the step-data from August 7, 2021, through August 10, 2021. Specifically, Agent Gibb testified that the data logged on the appellant's cell phone showed periods of continued activity into the late night and early morning hours of August 10th, up to 5:00 a.m. Agent Gibb testified further that during that time the appellant's phone logged text discussions between her and her boyfriend J.M., including discussions regarding their daughter and their intent to engage intimately. Agent Gibb testified that there was no activity logged on the Appellant's phone from the period between 5:00 a.m. to approximately 11:00 a.m.

{¶14} In addition, Agent Gibb testified regarding other step and text activity, including any periods of time during which there was no activity throughout the course of the day beginning at 11:00 a.m., after the device began logging data again. She provided itemized activity of intermittent step data, often in conjunction with text message exchanges with G.Y.'s mother and father, as well as the appellant's father and boyfriend. This included a text message from the appellant stating that she was so sick that she felt

she "was legit going to die" and looking for her pills. Agent Gibb testified regarding the step-activity reflected on the appellant's device, which occurred in conjunction with logged text messages asking her to come outside. Further, Agent Gibb testified regarding at least two instances of complete inactivity of the appellant's device, between 3:00 p.m. and 4:00 p.m. and again between 6:00 p.m. and 7:00 p.m.; and, one instance of heightened step activity logged at 7:33 p.m., just prior to the 911 call.

{¶15} Dr. Jeffrey Lee of the Licking County Coroner's office provided testimony in his capacity as the pathologist who performed G.Y.'s autopsy. Dr. Lee testified that G.Y. died from a closed head injury resulting from multiple instances of blunt force trauma. Dr. Lee testified that he observed multiple hemorrhages throughout the differing layers of G.Y.'s skull and brain, including subdural, subgalea, and sub-arachnoid hemorrhages on the top, left, and bottom of her brain, as well as a skull fracture on the back right of her skull behind her right ear. Dr. Lee testified that it was his opinion that G.Y. sustained said injuries within four hours of her death.

{¶16} Dr. Lee testified that although his initial ruling regarding the manner of G.Y.'s death was accidental, he attended a medical conference in May of 2023 where he heard a presentation by Dr. Michael Caplan involving a case study which Dr. Lee believed to be directly analogous to the injuries sustained by G.Y. Dr. Lee testified that this information, as well as new information provided to him regarding the size of the appellant's home and the fact that G.Y. was not yet walking independently at the time of her death, led him to opine that G.Y.'s injuries were, in fact, non-accidental. He therefore amended his ruling to homicide, and a new death certificate was issued. Dr. Lee testified that it was his opinion, within a reasonable degree of medical certainty, that G.Y.'s cause

of death was blunt force trauma, and the manner of death, based on the nature of her injuries, was homicide. During Dr. Lee's testimony, the jury was shown a series of sixteen autopsy photographs out of over seventy total photographs. The appellant did not object to the use of said photographs during trial.

{¶17} Finally, the appellee presented the testimony of Dr. Michael Caplan and Dr. Rebecca Folkerth, who were both consulted to review the autopsy findings of Dr. Lee. Dr. Caplan testified that he was a pediatric forensic pathologist, and Dr. Folkerth testified that she was a forensic neuropathologist. Both were experts in the fields of forensic pathology and autopsy examinations. Dr. Caplan and Dr. Folkerth both testified, inter alia, that they had reviewed the autopsy reports, photographs, findings, and laboratory specimens from Dr. Lee's office and, based upon their own independent and respective knowledge, training and experience, they both agreed with and corroborated Dr. Lee's opinion as to cause and manner of G.Y.'s death. Specifically, they opined that G.Y. had sustained multiple instances of blunt force trauma and a skull fracture, and that the manner of death was homicide. They both testified that they observed the same injuries as Dr. Lee – that is, multiple subdural, subgalea, and subarachnoid hemorrhages in multiple areas of the brain, as well as a left side skull fracture. Both Dr. Caplan and Dr. Folkerth described these fatal injuries as being acute injuries. Additionally, they both testified that G.Y. would have begun to experience symptoms immediate to the injury, and that death would have occurred within two to three hours of sustaining said injuries. Finally, both Dr. Caplan and Dr. Folkerth testified that the force necessary to cause the type of injuries sustained by G.Y. would be non-accidental in nature. Dr. Caplan and Dr. Folkerth referenced the same

sixteen autopsy photographs that Dr. Lee had referenced during his testimony. The appellant did not object to the appellee's use of these photographs during trial.

**{¶18}** The appellee rested, the appellant called no witnesses, and the parties presented closing arguments. The trial court instructed the jury, including an instruction on inference, an instruction on the burden of proof, and an instruction on the elements of the crime of Endangering Children. The jury found the appellant guilty on the sole charge of Endangering Children, and the trial court sentenced her to thirty-six months in prison.

**{¶19}** The appellant filed a timely appeal in which she sets forth the following six assignments of error:

**{¶20}** "I. THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT WHEN IT OBTAINED PERMISSION TO PRESENT INTIMATE TEXT MESSAGES TO THE JURY BASED UPON A MISREPRESENTATION OF THE CONTENTS OF THOSE MESSAGES."

**{¶21}** "II. THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION IN LIMINE AND ALLOWED PREJUDICIAL, IRRELEVANT, AND UNRELIABLE EVIDENCE TO BE PRESENTED TO THE JURY."

**{¶22}** "III. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED THE STATE TO SHOW INHERANTLY [SIC] PREJUDICIAL AND GRUESOME AUTOPSY PHOTOGRAPHS THREE TIMES OVER THREE DAYS BY USING THEM AS EXHIBITS FOR THREE EXPERT WITNESSES."

**{¶23}** "IV. THE JURY'S VERDICT IS BASED UPON AN IMPROPER STACKING OF INFERENCES."

**{¶24}** "V. NEFF'S CONVICTION FOR CHILD ENDANGERMENT IS BASED UPON LEGALLY INSUFFICIENT EVIDENCE AND AGAINST THE WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL."

**{¶25}** "VI. THE CUMULATIVE EFFECT OF MULTIPLE ERRORS AT TRIAL VIOLATED NEFF'S RIGHT TO A FAIR TRIAL."

### ASSIGMENT OF ERROR NO. I

**{¶26}** The appellant argues in her first assignment of error that the appellee engaged in prosecutorial misconduct when it filed a Motion in Limine to Include Specific Acts and Notice of Intent to Offer Same regarding the admission or exclusion of evidence concerning the appellant's activities and movements preceding the death of G.Y. We disagree.

### *Standard Of Review*

**{¶27}** The issue of prosecutorial misconduct was discussed by this Court in *State v. Lee*, 2024-Ohio-2044 (5th Dist.):

The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. *Sunbury v. Sullivan*, 5th Dist. Delaware No. 11CAC030025, 2012-Ohio-3699, ¶ 30, citing *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990).

In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained-of conduct in the context of the entire trial. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A trial is not unfair if, in the context of the entire trial, it appears clear beyond a

reasonable doubt the jury would have found the defendant guilty even without the improper comments. *State v. Treesh*, 90 Ohio St.3d 460, 464, 2001-Ohio-4, 739 N.E.2d 749.

Allegations of prosecutorial misconduct implicate due process concerns, and the touchstone of the analysis is the " 'fairness of the trial, not the culpability of the prosecutor.' " *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 92, *quoting Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

If any misconduct occurred, the court must consider the effect it had on the jury "in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). With regard to each allegation of misconduct, we must determine whether the conduct was "improper, and, if so, whether [it] prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[A] defendant's substantial rights cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously." *State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578, 957 N.E.2d 866, ¶ 30 (8th Dist. 2011), *citing State v. Williams*, 38 Ohio St.3d 346, 349–350, 528 N.E.2d 910 (1988).

Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact, which we review *de novo. State v. Razey*, 5th

Dist. Delaware No. 23CAC030021, 2023-Ohio-4190, ¶ 28, citing *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009).

*Id.* at ¶¶46-50.

### *Analysis*

**{¶28}** The appellant was charged with one count of Endangering Children in violation of R.C. 2919.22(A), which provides as follows:

> (A)     No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or disability of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

**{¶29}** The appellee argued in its Motion in Limine that the information contained in the appellant's cell phone data regarding her text messages and steps should be admissible to establish her actions, or lack thereof, preceding G.Y.'s death, and to assist in establishing that the appellant violated her duty of care, protection, or support to G.Y. when the child was placed in her care. The appellee sought to proffer text messages described by the appellant as private intimate messages between her and her live-in boyfriend to illustrate that the appellant was tired and sick, and therefore not able to properly care for an infant; and, distracted. These arguments were not made for the first

time in the presence of the jury; instead, they were brought before the trial court in a pretrial motion to ensure the appropriateness of their presentation during trial. This is the anthesis of prosecutorial misconduct, as the appellee's actions sought to protect the proceedings from undue prejudice. As succinctly described by the trial court in its Judgment Entry provisionally granting the appellee's Motion in Limine, "text messages suggesting illness, sleep deprivation, a planned sexual encounter, and marijuana use" are "direct evidence supporting the [appellee's] theory of the case that the [appellant] was asleep or distracted by fatigue and illness when she had a duty of care for decedent G.Y., and that the specific acts of the [appellant] recklessly created a substantial risk to the health and safety of G.Y."

{¶30} We find that the appellee did not engage in prosecutorial misconduct when it filed a Motion in Limine addressing the admissibility of intimate text messages between the appellant and her boyfriend, as the messages were proffered to establish the appellant's fatigue, illness, and state of distraction, and her arguable inability to properly discharge her duty of care, protection, or support for G.Y. as a result. The appellant's first assignment of error is, therefore, without merit.

## ASSIGMENT OF ERROR NOS. II and III

{¶31} Assignments of error numbers two and three both raise issues concerning the admissibility of evidence and the trial court's judgment entries regarding pre-trial motions in limine. As such, we shall address them together.

{¶32} The appellant argues in assignment of error number two that the trial court erred when it permitted the intimate text messages, step data, and evidence of the appellant's marijuana use the morning of G.Y.'s death to be presented to the jury. The

appellant argues in assignment of error number three that the trial court abused its discretion when it allowed the appellee to show autopsy photographs three times over three days with three expert witnesses. We disagree.

### *Standard Of Review*

**{¶33}** "[D]ecisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review." *Est. of Johnson v. Randall Smith, Inc.,* 2013-Ohio-1507, ¶ 22, citing *State v. Hancock,* 2006-Ohio-160. To find an abuse of discretion, this Court must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983).

### *Analysis*

**{¶34}** Although the appellant filed a brief in opposition to the appellee's Motion in Limine, and filed her own Motion in Limine regarding the autopsy photographs, she failed to object to the admission of the text messages, step data, marijuana use, and autopsy photographs during trial. While the appellant submits that she preserved all but the marijuana issue by "objecting to the [appellee's] motion in limine," and by "filing her own motion in limine to exclude the photographs," said filings, alone, are not sufficient to preserve these alleged errors for anything other than a plain error review. As set forth by this Court in *State v. Lipkins*, 2023-Ohio-1192 (5th Dist.):

> The decision on the motion in limine was a "tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated" but we need not review the propriety of the order because the claimed error was not preserved by a timely objection when the issue was reached during the

trial. *State v. White* (1982), 6 Ohio App.3d 1, 6 Ohio B. 23, 451 N.E.2d 533

as quoted in *State v. Grubb*, 28 Ohio St.3d 199, 203, 28 Ohio B. 285, 503

N.E.2d 142 (1986). The "[f]ailure to object to evidence at the trial constitutes

a waiver of any challenge, regardless of the disposition made for a

preliminary motion in limine. Evid.R. 103(A)(1); *State v. White, supra*;

*Fetzek v. Lafon* (December 13, 1979), Franklin App. No. 79AP-419, 1979

Ohio App. LEXIS 10238, unreported." State v. Wilson (1982), 8 Ohio App.3d

216, 220, 8 Ohio B. 288, 456 N.E.2d 1287, as quoted in *Grubb, supra* at

203.

Lipkins has waived the error, leaving nothing for our review. But,

even if we were to consider the assignment of error, our decision would

remain unchanged.

*Id.* at ¶ 78-79. Furthermore,

Appellant filed a motion in limine to exclude evidence of other bad

acts. However, appellant failed to object at trial to any of the evidence he

now claims was improperly admitted. A denial of a motion in limine does not

preserve error for appellate review; an objection must be raised to the

admission of the evidence at trial to preserve error. *State v. Brown*, 38 Ohio

St.3d 305, 311-12, 528 N.E.2d 523, 533 (1988).

Therefore, we must find plain error in order to reverse. In order to

prevail under a plain error analysis, appellant bears the burden of

demonstrating that the outcome of the trial clearly would have been different

but for the error. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

*State v. Joseph,* 2017-Ohio-588, ¶11-12 (5th Dist.). Thus, the appellant has waived all but plain error regarding the admissibility of evidence of her cell phone data, marijuana use, and autopsy photographs.

**{¶35}** The appellant was tried for endangering children; specifically, the appellee alleged that the appellant created a substantial risk to the health or safety of G.Y. by violating her duty to G.Y. of care, protection, or support. Evidence of the appellant's late night text messages suggesting illness, sleep deprivation, a planned sexual encounter, and marijuana use went to the issue of whether the appellant was asleep and/or distracted by fatigue and/or illness when she had a duty of care for G.Y., an infant whose life had been placed in her care. The above-described evidence went directly to the issue of whether the appellant acted recklessly, thereby creating a substantial risk to the health and safety of G.Y., who suffered fatal injuries while in the appellant's care.

**{¶36}** Additionally, the use of autopsy photographs by the appellee's expert witnesses also does not constitute plain error. There were over seventy autopsy photographs, only sixteen of which were used by the expert witnesses during their testimony at trial. Furthermore, because Dr. Lee initially ruled G.Y.'s death as accidental but later amended his ruling to homicide, the appellee presented the testimony of additional expert witnesses to support the appellee's argument that G.Y.'s death was not accidental, and would not have happened had the appellant properly discharged her duty of care, protection, or support of G.Y.

**{¶37}** We find that there was no plain error in the admission of the text messages, step data, marijuana use, and photographs. Nor would admission of the same constitute an abuse of discretion had the appellant objected to the admission of said evidence at trial. Accordingly, appellant's assignments of error numbers two and three are without merit.

### ASSIGMENT OF ERROR NO. IV

**{¶38}** The appellant argues in her fourth assignment of error that the jury's verdict finding her guilty of endangering G.Y. was based upon an improper stacking of inferences. We disagree.

### *Standard Of Review*

**{¶39}** Whether a conviction is based upon inference stacking goes to the sufficiency of the evidence. *State v. Guffie*, 2024-Ohio-2163, ¶ 64 (8th Dist.), citing *State v. Jones*, 2020-Ohio-3367, ¶ 66 (8th Dist.).

### *Analysis*

**{¶40}** The issue of the stacking of inferences was comprehensively discussed in *State v. Knott,* 2025-Ohio-5745 (4th Dist.):

"Inferences are '"conclusion[s] which, by means of data founded upon common experience, natural reason draws from facts which are proven."'" *In re A.R.*, 2025-Ohio-1160 (1st Dist.) ¶ 28, quoting *State v. Armstrong*, 2016-Ohio-7841, ¶ 22 (11th Dist.), quoting *State v. Nevius*, 147 Ohio St. 263, 274, 71 N.E.2d 258 (1947). "An inference 'may be drawn from the facts and conditions established.'" *Id.*, quoting *Armstrong* at ¶ 22. "'A trier of fact may not draw "[a]n inference based . . . entirely upon another

inference, unsupported by any additional fact or another inference [**46] from other facts[.]'"" *State v. Greeno*, 2021-Ohio-1372, ¶ 32, 170 N.E.3d 1224, quoting *State v. Cowans*, 87 Ohio St.3d 68, 78, 1999-Ohio 250, 717 N.E.2d 298 (1999), quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio. St. 329, 130 N.E.2d 820, paragraph one of the syllabus (1955). "'When an inference, which forms the basis of a conviction, is drawn solely from another inference and that inference is not supported by any additional facts or inferences drawn from other established facts, the conviction is improper.'" *Id.*, quoting *Armstrong* at ¶ 23.

"'Though widely denounced by both courts and legal commentators, the rule prohibiting the stacking of one inference upon another is still recognized in Ohio.'" *Greeno at* ¶ 33, quoting *Donaldson v. N. Trading Co.*, 82 Ohio App.3d 476, 481, 612 N.E.2d 754 (10th Dist. 1992). Accordingly, "'the rule has very limited application. It prohibits only the drawing of one inference solely and entirely from another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts.'" *Id.*, quoting *Donaldson*, 82 Ohio App.3d at 481.

As the Supreme Court of Ohio has observed, "'the rule forbidding the stacking of an inference upon an inference is disfavored by scholars and many courts. If such a rule were uniformly enforced, "* * * hardly a single trial could be adequately prosecuted."'" *Id.*, quoting *Motorists Mut. Ins. Co. v. Hamilton Twp. Trustees*, 28 Ohio St.3d 13, 17, 28 Ohio B. 77, 502 N.E.2d

204 (1986), quoting 1A Wigmore, Evidence (Tillers Rev. 1983) 1106, 1111, § 41.

The rule does not apply in two instances. *Greeno* at ¶ 30. "The first is when '[a]n inference which is based in part upon another inference and in part upon factual support is called a parallel inference and is universally approved provided it is a reasonable conclusion for the jury to deduce.'" *Id.*, quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 130 N.E.2d 820, paragraph three the syllabus (1955). "The second is when multiple inferences arise separately from the same set of facts." *Id.*, citing *McDougall v. Glenn Cartage Co.*, 169 Ohio St. 522, 160 N.E.2d 266, paragraph two of the syllabus (1959).

*Id.* at ¶ 94-97. The stacking of inferences was discussed by this Court in *State v. Niles*, 2004-Ohio-119 (5th Dist.):

Appellant argues that his conviction was improperly based upon stacking of inferences. Appellant argues that from evidence of appellant sending money to a contact involved in illegal activity in California, it can be inferred that appellant was sending money to pay for drugs. Appellant then argues that therefore it can be inferred that the package mailed from California was intended for appellant, and not for Tuesday Perry, and thus appellant possessed the marijuana and cocaine. Appellant argues that the second inference, that the package from California was intended for appellant, is not permitted, as it stacked on the inference that he had been sending money to California for drugs.

A second inference may be drawn upon a previous inference if the second inference is based at least in part on additional facts or inferences drawn from other facts; the rule against stacking of inferences is limited only to inferences drawn exclusively from other inferences. *State v. Cooper*, 147 Ohio App. 3d 116, 2002 Ohio 617, 768 N.E.2d 1223. When a jury bases its verdict partly on a reasonable inference drawn from facts in evidence, and partly on an inference drawn from both those same facts and from common human experience, the verdict is not the result of impermissible stacking of an inference upon an inference. *State v. Jacks* (1989), 63 Ohio App. 3d 200, 206, 578 N.E.2d 512.

The inference that the package from California was intended for appellant is not drawn solely from the evidence that appellant had sent money to California, and the related inference that the money was for the drugs received in the package from California. There was evidence that appellant was originally from California, and that appellant had been in the company of Jennifer Smith, the sender of the package, on numerous occasions in California. Further, there was evidence presented that an Ohio State Identification Card, with an address of 803 1/2 Locust Avenue, and a California birth certificate, both issued in the name of Jennifer Smith, were found in appellant's apartment. Tuesday Perry testified that before the package arrived, appellant called her and told her to get up and sign for the package. Appellant then came over to the apartment in order to open the package. The inference concerning the identity of the intended recipient of

the package was a parallel inference based in part on previous inferences, and in part on additional facts and evidence. The conviction was therefore not based on impermissible stacking of inferences.

Id. at ¶ 22-24.

**{¶41}** In the case sub judice, the trial court instructed the jury on inferences as follows:

> To infer, or to make an inference, is to reach a reasonable conclusion of fact that you may, but are not required to, make from other facts that you find have been established by direct evidence. You may reach a reasonable conclusion about a fact or facts only from other facts or circumstances that have been proved by the greater weight of the evidence. Whether an inference is made rests entirely with you.

The appellant argues that the jury improperly stacked inferences regarding G.Y.'s injuries and the appellant's recklessness. We disagree. The evidence presented to the jury included the testimony of G.Y.'s mother that G.Y., while a bit fussy due to teething, was otherwise healthy and behaving normally when she was dropped off at the appellant's home. K.D.R. testified that when he stopped at the appellant's home to pick up his child G.Y. appeared to be healthy and was behaving normally. Three different medical experts testified to the timeline and cause of G.Y.'s death; the fact that they worked backwards from her time of death to the time the injuries causing her death occurred - while in the appellant's care - does not vitiate their testimony, nor does it give rise to impermissible inferences.

**{¶42}** The appellant was not charged with a form of homicide under R.C. 2903. *et seq*. She was charged with endangering children under R.C. 2919.22(A), the elements of which the appellee proved through the presentation of facts, through both direct and circumstantial evidence. As set forth by this Court in *State v. Eden,* 2020-Ohio-2900, (5th Dist.): ". . . While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case." (Citations omitted.) *Id.* at ¶30. The jury herein did not base its finding of guilt upon improperly stacked inferences, and the appellant's fourth assignment of error is without merit.

## ASSIGMENT OF ERROR NO. V

**{¶43}** The appellant argues in her fifth assignment of error that her conviction is based upon insufficient evidence and is against the manifest weight of the evidence. We disagree.

### *Standard Of Review*

**{¶44}** Sufficiency of the evidence was addressed by the Ohio Supreme Court in *State v. Worley,* 2021-Ohio-2207, as follows:

> The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443

U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). " 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E). A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219.

*Id.* at ¶57. Thus, a review of the constitutional sufficiency of evidence to support a criminal conviction requires a court of appeals to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

{¶45} Manifest weight of the evidence, on the other hand, addresses the evidence's effect of inducing belief. *State v. Thompkins,* 78 Ohio St.3d 380, 386–387 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 1997–Ohio–355. The *Thompkins* Court stated:

Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis added.) Black's, *supra,* at 1594.

*Id.* at 387. The Court stated further:

> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs,* 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*Id.*

{¶46} In addition, the Court stated in *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77 (1984):

> "* * * [I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *
>
> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with

the verdict and judgment, most favorable to sustaining the verdict and

judgment."

*Id.* at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–

192 (1978).

### *Analysis*

**{¶47}** The appellant was charged with Endangering Children in violation of R.C.

2919.22(A), which provides that no person who has custody or control of a child under

eighteen years of age shall create a substantial risk to the health or safety of the child by

violating a duty of care, protection, or support. This Court addressed a factually analogous

case in *State v. Gaver,* 2016-Ohio-7055 (5th Dist.). In *Gaver,* a small child was in the care

of his mother's boyfriend when the child suffered a traumatic brain injury. The boyfriend

was convicted of one count of endangering children in violation of R.C.

2919.22(A)(E)(2)(c), and appealed. This Court stated:

> Our review of relevant authority convinces us that R.C. 2919.22(A)
>
> addresses a wider category of cases than those described by appellant in
>
> which a defendant fails to promptly seek medical attention for a child under
>
> his or her care.  This section may also apply where a defendant has failed
>
> to protect the child from harm inflicted upon the child while in the defendant's
>
> care, even if the jury is not convinced the defendant personally inflicted the
>
> injury. Under R.C. 2919.22(A), appellee was required to prove beyond a
>
> reasonable doubt that (1) appellant was the parent, guardian, custodian,
>
> person having custody or control, or person in loco parentis of A.G., and (2)
>
> appellant recklessly violated a duty of protection, care or support imposed

by law which created a substantial risk to A.G.'s health or safety. *State v. McGee*, 79 Ohio St.3d 193, 1997 Ohio 156, 680 N.E.2d 975 (1997), syllabus. A "'[s]ubstantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "The existence of the culpable mental state of recklessness is an essential element of the crime of endangering children under R.C. 2919.22(A)." *McGee, supra*, 79 Ohio St.3d 193 at syllabus. A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. R.C. 2901.22(C). A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist. *Id.*

\*  \*  \*

Appellant does not contest the jury's findings that he was the person having custody or control of A.G or that A.G. sustained serious physical harm. He argues simply that appellee presented no evidence that he breached a duty of care to A.G. We find sufficient credible evidence appellant breached his duty to protect A.G. According to appellee's evidence, A.G. was a healthy two-year-old at the time he was entrusted to appellant's care, although he had some developmental delays. A.G.'s doctors agreed he suffered one or more significant blunt force traumas to his head with a violent shaking or rotational component, resulting in injuries

characteristic of inflicted head injury: significant subdural hematoma and retinal hemorrhages in both eyes. While in appellant's care, A.G. first exhibited symptoms of the injuries, including lethargy, an apparent seizure, and collapse. Appellee's expert opined the injuries did not result from an accident or other non-accidental cause; Steiner unequivocally testified the injury resulted from an act of abuse.

*Id.* at ¶54, 56. The *Gaver* Court stated further:

Appellant offers no authority that a conviction pursuant to R.C. 2919.22(A) is not supported in a case in which the state's theory is the child's injuries resulted from violent forceful trauma while in the defendant's care. The case law we have reviewed indicates that R.C. 2919.22(A) applies when a child is injured while in a defendant's care, rising to the level of an inexcusable failure to act in discharge of a duty to protect a child….

*Id*. at ¶59. The Court affirmed the boyfriend's conviction.

**{¶48}** Similarly, in this case G.Y. suffered fatal injuries while in the appellant's care. G.Y.'s mother testified that G.Y., while a bit fussy due to teething, was otherwise healthy when she was dropped off at the appellant's home. K.D.R. testified that when he stopped at the appellant's home to pick up his child G.Y. appeared to be healthy and was behaving normally. The jury heard the testimony of the paramedic who responded to the 911 call; detectives who investigated the incident; an investigator with Children Services who was contacted following G.Y.'s death while in the appellant's care and was involved in the investigation into her death; an agent who analyzed the appellant's cell phone data and step data, and testified regarding what that data indicated regarding the appellant's

activities and movements during the hours preceding G.Y.'s death; and, three different medical experts who testified regarding G.Y.'s cause of death as well as the time-line of her death.

{¶49} The jury heard the testimony of the witnesses and viewed all the evidence, deliberated, and found the appellant guilty. We cannot say, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime with which the appellant was charged beyond a reasonable doubt. Nor can we say that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The appellant's assignment of error number five is, therefore, without merit.

## ASSIGMENT OF ERROR NO. VI

{¶50} The appellant argues in her sixth assignment of error that the cumulative effect of multiple errors during trial violated her right to a fair trial. We disagree.

### *Standard Of Review*

{¶51} Cumulative error was discussed by the Ohio Supreme Court in *State v. Powell*, 2012-Ohio-2577:

> *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal. *Id*. at 196–197, 509 N.E.2d 1256. *See also State v.*

*Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132;
*Garner,* 74 Ohio St.3d at 64, 656 N.E.2d 623.

The doctrine of cumulative error is not applicable in the present case. Powell received a fair trial. Moreover, none of the errors committed in this case, when considered either individually or cumulatively, resulted in prejudicial error. As previously discussed in other propositions of law, overwhelming evidence was introduced that established Powell's guilt. Thus, we reject proposition XXIII.

*Id.* at ¶¶ 223-224.

### *Analysis*

**{¶52}** In the appellant's sixth assignment of error, she submits that she was denied a fair trial due to the aggregate number of errors committed by the trial court. The alleged cumulative errors are those raised in the appellant's assignments of error numbers one through five. Having found the appellant's contentions to be without merit in each addressed error, we similarly conclude that their cumulative effect did not deny the appellant a fair trial. Accordingly, we find the appellant's sixth assignment of error to be without merit.

**CONCLUSION**

**{¶53}** Based upon the foregoing, the appellant's assignments of error numbers one, two, three, four, five, and six are without merit, and are therefore overruled. The decision of the Coshocton County Court of Common Pleas is hereby affirmed.

**{¶54}** Costs to appellant.


By: Baldwin, P.J.

Popham, J. and

Gormley, J. concur.