[Cite as *State v. Owens*, 2026-Ohio-2266.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO, | Case No. 2025CA00056 |
| Plaintiff - Appellee | Opinion And Judgment Entry |
| -vs- | Appeal from the Stark County Court of Common Pleas, Case No. 2024-CR-1436 |
| NICHOLAS J. OWENS, | Judgment:   Affirmed |
| Defendant - Appellant | Date of Judgment Entry: June 15, 2026 |

**BEFORE:** Craig R. Baldwin; Robert G. Montomgery; David M. Gormley, Judges

**APPEARANCES:** KYLE STONE, Prosecuting Attorney, CHRISTOPHER A. PIEKARSKI, Assistant Prosecuting Attorney, for Plaintiff-Appellee; JULIE A. JAKMIDES, JEFFREY JAKMIDES, for Defendant-Appellant.

*Baldwin, P.J.*

{¶1}   The appellant, Nicholas J. Owens, appeals his conviction and sentence on two counts of theft from a person in a protected class following a bench trial. Appellee is the State of Ohio. For the reasons that follow, we affirm the decision of the trial court.

**STATEMENT OF FACTS AND THE CASE**

{¶2}   On August 14, 2024, the appellant was indicted on the following: Count One, Theft From a Person in a Protected Class in violation of R.C. 2913.02(A)(1) and/or (2) and/or (3)/(B)(3), a felony of the first degree; and, Count Two, Theft From a Person in a Protected Class in violation of R.C. 2913.02(A)(1) and/or (2) and/or (3)/(B)(3), a felony of the first degree. The Indictment alleged that said offenses occurred from September 1, 2020, through approximately June 10, 2024. In addition, the Indictment

alleged that the value of the stolen property exceeded $150,000. The appellant pleaded not guilty at his September 6, 2024, arraignment.

{¶3} The matter proceeded to a bench trial at which the following evidence was presented. Victim M.F. (D.O.B. 10/5/1928) is the great aunt of both the appellant and his sister, J.S. M.F. is also the aunt of the appellant's second cousin, G.C. M.F has no children, and her siblings have all predeceased her. J.S. testified that she was close with M.F., spoke with her daily by phone, and visited her weekly. J.S. testified that M.F., who grew up during the Depression, is known to be a "frugal" person and a "saver." J.S. became concerned about M.F. in 2019 because she had fallen a few times, her memory was starting to "slip," and she would forget to eat.

{¶4} J.S. spoke to the appellant, as well as G.C., about her concerns. The appellant repeatedly assured J.S. that M.F. "was fine." However, G.C. was also concerned regarding the changes she had begun to see in M.F., as G.C.'s mother had exhibited similar behavior when she developed dementia. J.S. and G.C. took M.F. to visit the assisted-living apartments at the Canton Christian Home ("CCH"). However, M.F. did not want to leave her home, where she had lived for decades. A few weeks later M.F. told J.S. that M.F. no longer had to leave her home because the appellant had agreed to take care of her.

{¶5} In July of 2019, M.F. executed a durable power of attorney ("POA") naming the appellant her attorney in fact. Said POA expressly stated that the appellant was not authorized to make any gifts unless expressly authorized to do so by M.F. and initialed under the "special instructions" section of the POA. No special instructions were listed under said section. By November of 2020, the appellant had moved M.F. into the CCH.

{¶6} Attorney J.B., who prepared the POA, testified that he does not recommend those with durable POA's give gifts to themselves because it would be "inappropriate."

J.B. testified that the appellant did not have the power to make any gifts with his durable POA. J.B. also drafted a trust for M.F. and her late husband in July of 2008. M.F. is listed as the trustee, while the appellant and J.S. are listed as successor co-trustees.

{¶7} J.S. still visited M.F. after the appellant moved her into the CCH. However, M.F. soon showed signs of "sundowning syndrome," which left her confused and "extremely forgetful." M.F. would get emotional during evening visits, did not understand why she was there, and would beg J.S. to "get her out of there."

{¶8} L.M. is the Director of Social Services at the CCH and M.F.'s social worker. He has interacted with M.F. daily since January of 2023, and described M.F. as "pleasantly confused." L.M. testified that M.F. does not know the time, day, or month, or what she is supposed to be doing that day. M.F. talks with L.M. about her sister and parents, sometimes referencing her sister and parents as though they are still alive. L.M. testified that although usually pleasant, M.F. sometimes gets physically aggressive by pinching or swinging at staff when they attempt to assist her or redirect her.

{¶9} L.M. testified that M.F. has lived in all three levels of the CCH – independent living, assisted living, and nursing home care. M.F. moved into the nursing home section in 2022, where she requires 24-hour care and supervision. She can eat on her own, but every other aspect of her life requires the help of staff. She does not have a computer or a smart phone, and does not have access to her ID or credit cards. M.F. is wheelchair-bound and has been for the entirety of her time at the CCH. She is unable to locate her room even though the residents' names are displayed on their doors. L.M. was asked if he had noticed a decline in M.F.'s cognitive abilities, to which he responded "Yeah . . . her ability to make decisions . . . she doesn't have the insight."

**{¶10}** After the appellant moved M.F. to the CCH, he told J.S. to stop visiting her, saying her visits were upsetting M.F. and effectively isolating M.F. from J.S. In February of 2021, the appellant emailed Attorney J.B., seeking his influence in getting G.C. to remove herself from M.F.'s accounts. G.C. recalled receiving a letter from J.B. asking her to remove her name from M.F.'s accounts because Chase Bank would not remove her name without her written consent. G.C. refused to do so after speaking with the bank, testifying that she wanted to be able to monitor the accounts. The appellant also sought Attorney J.B.'s assistance in transferring ownership of M.F.'s 1965 Mustang to himself. The appellant ultimately drafted an assignment for the Mustang, which he later had M.F. sign. The appellant thereafter contacted Attorney J.B. regarding the preparation of a document through which M.F. could resign as trustee of her trust. The appellant also inquired about the nature of the joint power he would be required to share with his sister J.S. if M.F. was no longer the trustee of the trust.

**{¶11}** J.S. contacted G.C. regarding her concerns about M.F., and the two went to the police in May of 2024. G.C.'s POA was still active, thus enabling her to review M.F.'s financial statements. G.C. noticed that "[a]lmost all of the money was gone," noting that from 2020 to 2024 M.F.'s savings account had decreased from $158,000 to $20,000, her checking account decreased from $46,000 to $6,000, and her 401(k) had decreased from $120,000 to $60,000. G.C. also noted that no checks had been written; instead, M.F.'s funds were being transferred into two other accounts. The funds were first transferred into a joint account shared by the appellant and M.F., and then shortly thereafter into an unknown account. M.F.'s 401(k) account had also been significantly depleted, and her social security benefits "dropped dramatically," while the cost of her Medicare "went up drastically," because her income had increased significantly.

**{¶12}** D.L. is a certified public accountant who owns a local tax service business. He has prepared M.F.'s tax returns since 2019. He testified that taxpayers are obligated to file a separate gift tax return whenever gifts exceed the annual exclusion amount, and was unaware of any monetary gifts that M.F. gave to the appellant between 2019 and 2023.

**{¶13}** Detective Matthew King testified that M.F.'s estate was worth close to $1.2 million prior to her granting the POA to the appellant. However, once the appellant was appointed M.F.'s POA in 2020, large transactions started coming out of her accounts, and her credit card was being used. Detective King determined that the appellant took approximately $550,000 from M.F., and testified that from September 2020 through June of 2024 approximately $300,000 was deposited into the joint account the appellant held with M.F. before being transferred into the appellant's personal checking account, where it was used to pay for his vacations, credit cards, and daily expenses. King testified that none of said money went toward M.F.'s care.

**{¶14}** Detective King testified in detail regarding every monthly financial statement from September 2020 through June of 2024, as well as many other relevant financial documents. Video footage from Detective King's body cam when he entered the appellant's property to serve a search warrant was entered into evidence; it shows a shed, an RV, a basketball hoop, and a massive pole barn which houses a car lift, a full bar, multiple TV's, refrigerators, cabinets, vehicles, a full tractor, toolboxes, and a safe. In addition, evidence was presented during trial that the appellant and his spouse took "lavish" vacations. Evidence of the appellant's income, and that of his spouse, was presented at trial, and showed their combined adjusted gross income was approximately

$130,345 in 2021, $160,775 in 2022, and $161,000 in 2023. The appellant did not cross-examine Detective King.

{¶15} Jeffrey Paul works as an investigator for the Stark County Prosecutor's Office; he analyzed the voluminous financial records in the case and prepared a spreadsheet to keep track of the information contained therein. The appellee averred that it was not offering Paul as an "expert" in any way. The appellant objected to Paul's testimony as improper "expert" testimony, but the trial court overruled the appellant's objection. Paul testified that he had, in his capacity as an investigator, reviewed the financial records for three of M.F.'s accounts, as well as the appellant's personal checking account, and created a spreadsheet using the BankScan program. He found that money would always start out in an account exclusive to M.F., then would be transferred into the joint account shared by M.F. and the appellant, then would be transferred into an account exclusive to the appellant. Paul testified that a total of $550,676.58 had been transferred from M.F.'s three accounts into the appellant's account. In doing his analysis, Paul acknowledged that the appellant could have made some legitimate expenditures on M.F.'s behalf, so he gave the appellant "credit" for such expenditures (for example, the tens of thousands of dollars spent each year on Attorney J.B.; a cemetery expense; a funeral expense; and other things of that nature). In addition, Paul gave the appellant credit for any unknown deposits and expenditures that he could not identify; for example, Walmart, and Sam's Club purchases. He also gave the appellant credit any time he saw the appellant transferring money out but then right back into M.F.'s accounts. Paul concluded that the total adjusted amount missing from the victim's accounts was $303,425.81. The appellant did not cross-examine Investigator Paul.

{¶16} Sometime in the summer or fall of 2024, J.S. went to M.F.'s home to retrieve some of her clothing. J.S. photographed M.F.'s home to document the state of the home, and the photos were admitted into evidence at trial. M.F. had family heirloom antique furniture in her home that was missing. Her Diebold safe was open and completely empty, even though M.F. and her husband kept their important documents and envelopes of cash inside. M.F. also had a lot of "high-end" jewelry she kept in the safe, which was also gone.

{¶17} J.S. testified that M.F.'s condition has not improved from 2019 to 2024, and in fact has gotten worse. J.S. testified that she wanted to test her suspicion that M.F. was incapable of knowing what she was signing; during one visit with M.F. at the CCH in the summer of 2024, J.S. placed a blank piece of paper in front of M.F. and said, "Hey . . . will you sign this for me?" J.S. testified that M.F. said "sure" and signed the blank piece of paper, no questions asked.

{¶18} Counsel for the appellant argued that the appellant was the only family member who regularly cared for and attended to M.F., and that M.F. "was historically big-hearted" when it came to the appellant, including "opening a savings account for him and funding it generously."

{¶19} The trial court found the appellant guilty on both charges of Theft From a Person in a Protected Class. The court merged Count Two into Count One and sentenced the appellant to an indefinite prison term, with a minimum of 3 years up to a maximum of 4 ½ years, but held the prison sentence in abeyance pending completion of the appeals process. The court further ordered the appellant to pay $303,425.81 in restitution to the victim.

{¶20} The appellant filed a timely appeal in which he raises the following six assignments of error:

{¶21} "I. THE TRIAL COURT ERRED BY DENYING APPELLANT'S CRIM.R. 29(A) MOTION FOR ACQUITTAL, AND THEREAFTER ENTERING A JUDGMENT OF CONVICTION ON THEFT OFFENSES WHERE THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN CONVICTIONS."

{¶22} "II. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AND MUST BE REVERSED."

{¶23} "III. APPELLANT'S RIGHT TO A FAIR AND IMPARTIAL TRIAL AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION WAS DENIED BY THE TRIAL COURT'S ABANDONMENT OF NEUTRALITY AND ASSUMED ROLE OF A THIRD PROSECUTOR DURING THE STATE OF OHIO' S CASE-IN-CHIEF."

{¶24} "IV. APPELLANT'S DUE PROCESS RIGHTS AND RIGHTS TO A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 5 AND 10, ARTICLE I OF THE OHIO CONSTITUTION WERE VIOLATED BY PROSECUTORIAL MISCONDUCT."

{¶25} "V. APPELLANT'S DUE PROCESS RIGHTS AND RIGHTS TO A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 5 AND 10, ARTICLE I OF THE OHIO CONSTITUTION WERE VIOLATED BY THE TRIAL COURT PERMITTING THE STATE'S UNDISCLOSED EXPERT WITNESS TO OFFER UNQUALIFIED OPINION TESTIFY [SIC] WHEN IT HAD FAILED TO COMPLY WITH CRIM.R. 16(K), AND THE ORDER OF RESTITUTION WAS UNSUPPORTED BY CREDIBLE FINANCIAL EVIDENCE AND CAN BE TRACED PRECISELY TO THE UNDISCLOSED

"REPORT" AND IMPROPER, SPECULATIVE OPINION TESTIMONY OF THE STATE' S UNDISCLOSED AND UNQUALIFIED EXPERT IN VIOLATION OF CRIM.R. 16(K)."

**{¶26}** "VI. APPELLANT WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 5 AND 10, ARTICLE I OF THE OHIO CONSTITUTION BY THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS DURING THE TRIAL."

### ASSIGNMENTS OF ERROR NOS. I & II

**{¶27}** The appellant submits in assignments of error numbers one and two that the trial court's verdict is based upon insufficient evidence and as such the trial court erred in denying his Crim.R. 29(A) Motion for Acquittal, and is against the manifest weight of the evidence. We disagree.

**{¶28}** Although sufficiency of the evidence and manifest weight entail different legal concepts, both entail a review of the record, and as such we shall address the appellant's assignments of error numbers one and two together.

### *Standard Of Review*

**{¶29}** The appellant's assignment of error number one challenges the sufficiency of the evidence, while his assignment of error number two challenges the manifest weight of the evidence. Sufficiency of the evidence was addressed by the Ohio Supreme Court in *State v. Worley,* 2021-Ohio-2207, as follows:

> The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991),

paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). " 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E). A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219.

*Id*. at ¶57. Thus, a review of the constitutional sufficiency of evidence to support a criminal conviction requires a court of appeals to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**{¶30}** Manifest weight of the evidence, on the other hand, addresses the evidence's effect of inducing belief. *State v. Thompkins,* 78 Ohio St.3d 380, 386–387 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 1997–Ohio–355. The *Thompkins* Court stated:

Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight

is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis added.) Black's, *supra,* at 1594.

*Id.* at 387. The Court stated further:

> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs,* 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*Id.*

In addition, the Court stated in *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77 (1984):

> "* * * [I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Id.* at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978).

### *Analysis*

**{¶31}** The appellant was indicted on two counts of theft from a protected person in violation of R.C. 2913.02, which provides in pertinent part:

(A)     No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1)     Without the consent of the owner or person authorized to give consent;

(2)     Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3)     By deception;

\*        \*        \*

(B) (3) Except as otherwise provided in division (B)(4), (5), (6), (7), (8), or (9) of this section, if the victim of the offense is an elderly person, disabled adult, active duty service member, or spouse of an active duty service member, a violation of this section is theft from a person in a protected class, and division (B)(3) of this section applies. . . . If the value of the property or services stolen is one hundred fifty thousand dollars or more,

theft from a person in a protected class is a felony of the first degree. If the victim of the offense is an elderly person, in addition to any other penalty imposed for the offense, the offender shall be required to pay full restitution to the victim and to pay a fine of up to fifty thousand dollars. . . .

 "'Elderly person' means a person who is sixty-five years of age or older." R.C. 2913.01(CC).

{¶32} Evidence presented at trial establishing that the appellant had utilized over $300,000 of M.F.'s monies to fund his lifestyle, including but not limited to buying vehicles and an RV, paying off credit card debt, building an elaborate pole barn, going on vacations, and going to concerts. The testimony of Investigator Paul documented the financial trail which established how M.F.'s monies ultimately ended up in the appellant's personal bank account, and was ultimately used for the appellant's personal benefit. The appellant argues that the witnesses who testified regarding M.F.'s history and her mental state were not credible. However, it is axiomatic that the trier of fact, in this case the trial judge, is the final arbiter of witness credibility.

{¶33} The trial judge heard the testimony of the witnesses and viewed all the evidence, deliberated, and found the appellant guilty of both counts of theft from an elderly person.  We cannot say, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of said crimes beyond a reasonable doubt. Nor can we say that the trial judge clearly lost his way and created such a manifest miscarriage of justice that the appellant's convictions must be reversed and a new trial ordered. We therefore find the appellant's assignments of error numbers one and two to be without merit.

## ASSIGNMENT OF ERROR NO. III

**{¶34}** The appellant argues in his third assignment of error that the trial court abandoned its duty of neutrality and assumed the role of a third prosecutor during the appellee's case-in-chief, thus depriving the appellant's right to a fair and impartial trial. We disagree.

### *Standard Of Review*

**{¶35}** The standard of review of a trial court's decision to inquire of a witness was addressed by this Court in *Kemp v. Kemp,* 2021-Ohio-2419 (5th Dist.):

> Evidence Rule 614(B) specifically provides that the trial court may interrogate witnesses in an impartial manner. Because Evidence Rule 614(B) permits the trial court discretion to decide whether or not to question a witness, appellate courts must review the trial court's questioning under an abuse of discretion standard. *Brothers v. Morrone-O'Keefe Dev. Co. LLC*, 10th Dist. Franklin No. 05AP-161, 2006-Ohio-1160....

*Id*. at ¶29. To find an abuse of discretion, we must find that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

### *Analysis*

**{¶36}** The appellant submits that the trial judge, during the appellant's bench trial, inappropriately questioned witnesses during the appellee's presentation of its case, thereby prejudicing the appellant.

**{¶37}** The calling and interrogation of witnesses is governed by Evid.R. 614, which states:

(A)     **Calling by court**. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

(B)     **Interrogation by court**. The court may interrogate witnesses, in an impartial manner, whether called by itself or by a party.

(C)     **Objections**. Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present.

The reference to "the jury" in subsection (C) implies that the Rule is primarily concerned with ensuring that a trial court's interrogation of a witness must be impartial so as not to influence the jury. Indeed, this Court stated in *Kemp* that "a trial court enjoys even greater freedom in questioning witnesses during a bench trial, because the court cannot prejudicially influence a jury with its questions or demeanor." *Kemp* at ¶29.

{¶38} Furthermore, the appellant submits that the trial court's questions exhibited judicial bias. The appellant argues that the trial court engaged in more questions of Paul than the prosecutor (ten pages' worth) and inquired similarly of Detective King. However, the appellant fails to point to precisely how this alleged transgression resulted in prejudice. The mere fact that the appellant was found guilty, without more specific examples of how the trial judge's questions actually prejudiced the appellant, does not rise to the level of an abuse of discretion. Furthermore, the appellant concedes in his brief at page 16 that he declined to question both Detective King and Investigator Paul.

{¶39} Based upon our review of the record, we cannot say that the trial court acted unreasonably, arbitrarily, or unconscionably during the appellant's bench trial when it asked questions of various witnesses. Accordingly, we find that the trial court did not

abuse its discretion when it so inquired, and the appellant's third assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. IV

{¶40}The appellant argues in his fourth assignment of error that the prosecutor engaged in prosecutorial misconduct, thereby denying him his rights to due process. We disagree.

### *Standard Of Review*

{¶41} The issue of prosecutorial misconduct was recently discussed by this Court in *State v. Lee*, 2024-Ohio-2044 (5th Dist.):

> The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. *Sunbury v. Sullivan*, 5th Dist. Delaware No. 11CAC030025, 2012-Ohio-3699, ¶ 30, citing *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990).

> In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained-of conduct in the context of the entire trial. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A trial is not unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt the jury would have found the defendant guilty even without the improper comments. *State v. Treesh*, 90 Ohio St.3d 460, 464, 2001-Ohio-4, 739 N.E.2d 749.

> Allegations of prosecutorial misconduct implicate due process concerns, and the touchstone of the analysis is the " 'fairness of the trial, not the culpability of the prosecutor.' " *State v. Newton*, 108 Ohio St.3d 13,

2006-Ohio-81, 840 N.E.2d 593, ¶ 92, *quoting Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

If any misconduct occurred, the court must consider the effect it had on the jury "in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). With regard to each allegation of misconduct, we must determine whether the conduct was "improper, and, if so, whether [it] prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[A] defendant's substantial rights cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously." *State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578, 957 N.E.2d 866, ¶ 30 (8th Dist. 2011), *citing State v. Williams*, 38 Ohio St.3d 346, 349–350, 528 N.E.2d 910 (1988).

Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact, which we review *de novo. State v. Razey*, 5th Dist. Delaware No. 23CAC030021, 2023-Ohio-4190, ¶ 28, citing *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009).

*Id.* at ¶¶46-50.

### *Analysis*

**{¶42}** The appellant submits that the prosecutor's references to M.F.'s capacity, cognitive abilities, and competence constituted misconduct such that his fundamental Constitutional rights were violated, thus warranting a new trial. The appellee submits that

the appellant failed to object to the comments during trial and has therefore waived all but plain error; and, even if the appellant had objected during trial any such error was not prejudicial.

{¶43} The Ohio Supreme Court recently discussed the doctrine of plain error in *State v. Bailey,* 2022-Ohio-4407:

> Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus ("Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice"). To prevail under the plain-error doctrine, Bailey must establish that "an error occurred, that the error was obvious, and that there is 'a reasonable *probability* that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis added in *Rogers*.) *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 66, quoting *Rogers* at ¶ 22; *see also State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 52.

> The elements of the plain-error doctrine are conjunctive: all three must apply to justify an appellate court's intervention. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) ("By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial").

*Id*. at ¶8-9. Thus, to overcome plain error, the appellant must satisfy all three prongs. He has failed to do so.

**{¶44}** To prevail under the plain-error doctrine, the appellant must first establish that an error occurred. The appellant has failed to establish error regarding references to M.F.'s cognitive abilities and/or capacity, as it is axiomatic that comments made by counsel during opening statements and closing arguments are not evidence. *State v. Asp*, 2023-Ohio-290, ¶59 (5th Dist.). In addition, the appellant failed to establish that there is a reasonable probability that the alleged error resulted in prejudice; that is, that the error affected the outcome of the trial. There is simply no evidence that the trier of fact - in this case the trial judge, who is a retired common pleas court judge with decades of experience - was prejudiced by references to M.F.'s cognitive abilities and capacity. Moreover, because this matter was tried to the bench and not to a jury, the judge is presumed to allocate the appropriate weight to all evidence presented. Indeed, "a judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record." *State v. Eubank*, 60 Ohio St. 2d 183, 187 (1979).

**{¶45}** Further, any comments made by L.M. regarding his observations about M.F.'s condition, as well as her ability to understand the world around her, were not based upon a diagnosis of dementia or Alzheimer's, but rather, upon L.M.'s observations of M.F. in light of his many years of experience as a social worker. The trial court was certainly able to parse evidence that was permissible from evidence that was not, and render an appropriate decision at the conclusion of the bench trial. The appellant's fourth assignment of error is without merit.

**ASSIGNMENT OF ERROR NO. V**

{¶46} The appellant argues in his fifth assignment of error that the trial court erred when it deemed Investigator Paul a lay witness and allowed him to testify as such. We disagree.

### *Standard Of Review*

{¶47} "A trial court possesses broad discretion with respect to the admission of evidence and an appellate court will not disturb evidentiary rulings absent an abuse of discretion." *Mitchell v. Manders*, 2015-Ohio-1529, ¶ 54 (5th Dist.). As set forth above, to find an abuse of discretion we must find that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore, supra.*

### *Analysis*

{¶48} Article VII of the Ohio Rules of Evidence governs opinion testimony of lay witnesses and expert witnesses. Evid.R. 701 addresses opinion testimony of lay witnesses, and states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Evid.R. 702 addresses testimony by expert witnesses, and states:

> A witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

**{¶49}** In the case sub judice, the appellee specifically stated during trial that it was not proffering Investigator Paul as an expert witness. Rather, Paul was the investigator who undertook a detailed review of the voluminous financial records in the case. Paul prepared a spreadsheet in order to keep track of his review of the records due to their sheer volume. The spreadsheet was not an expert report, but rather, simply a way to manage the large number of financial records present in the case. Furthermore, testimony

regarding the evidence contained in the financial records did not require any particular expertise to understand. The spreadsheet merely enabled Paul to speak to the issues presented by the appellant's various transfers and expenditures in his capacity as POA for M.F.

**{¶50}** Paul's testimony was rationally based upon his perception of the records following his detailed review of the same. Furthermore, the spreadsheet was helpful in reaching a clear understanding of Paul's testimony, and to the determination regarding the appellant's utilization of M.F.'s funds.

**{¶51}** The appellant submits that Paul's testimony and his use of the spreadsheet he prepared during his detailed examination of the financial records in this case violates Crim.R. 16(K). We find this argument to be unpersuasive. Crim.R. 16(K) provides:

> **(K) Expert witnesses; reports.** An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

The spreadsheet prepared by Paul was not based upon any expert qualification on Paul's part; it was simply a way to manage the plethora of financial information presented by the appellant's management of M.F.'s monies over a nearly four-year period. Furthermore, the use of software to process literally hundreds of bank documents does

not rise to the level of expert testimony, nor does it rise to the level of an expert report. Accordingly, we find the appellant's fifth assignment of error to be without merit.

## ASSIGNMENT OF ERROR NO. VI

{¶52} The appellant argues in his sixth assignment of error that the cumulative effect of multiple errors during trial violated his right to a fair trial. We disagree.

### *Standard of Review*

{¶53} Cumulative error was discussed by the Ohio Supreme Court in *State v. Powell*, 2012-Ohio-2577:

> *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal. *Id.* at 196–197, 509 N.E.2d 1256. *See also State v. Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132; *Garner,* 74 Ohio St.3d at 64, 656 N.E.2d 623.

> The doctrine of cumulative error is not applicable in the present case. Powell received a fair trial. Moreover, none of the errors committed in this case, when considered either individually or cumulatively, resulted in prejudicial error. As previously discussed in other propositions of law, overwhelming evidence was introduced that established Powell's guilt. Thus, we reject proposition XXIII.

*Id*. at ¶¶ 223-224.

### *Analysis*

{¶54} In the appellant's final assignment of error, he submits that he was denied a fair trial due to the aggregate number of errors committed by the trial court. The alleged cumulative errors are those raised in the appellant's assignments of error numbers one through five. Having found the appellant's contentions to be without merit in each addressed error, we similarly conclude that their cumulative effect did not deny the appellant a fair trial. Accordingly, we find the appellant's sixth assignment of error to be without merit.

### CONCLUSION

{¶55} Based upon the foregoing, the appellant's assignments of error numbers one, two, three, four, five, and six are without merit and are therefore overruled. The decision of the Stark County Court of Common Pleas is hereby affirmed.

{¶56} Costs to appellant.

By: Baldwin, P.J.

Montgomery, J. and

Gormley, J. concur.